894 S.W.2d 441 (1995)
Suzanne BENNETT, Mary Boothe, Neal D. Crane, LaFaun Gilley, James R. and Joan Haney, Wayne and June Haney, Ward A. Hogue, Charles and Beverly Lasiter, Roberta A. Luxon, Thomas and Mary Jane Micallef, Robert E. Peterson, Frank and Josephine Prochaska, Clifford W. and Claudia Teague, Jim and Berna Williamson, and Edwin J. and Dawn Youngblood, Appellants,
v.
TARRANT COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NUMBER ONE, Appellee.
No. 2-94-045-CV.
Court of Appeals of Texas, Fort Worth.
February 22, 1995.
Rehearing Overruled March 21, 1995.
*444 Blackburn & Carter and James B. Blackburn, Jr., James E. Bradley, Larry G. Dunbar, Houston, for appellants.
Pope, Hardwicke, Christie, Harrell, Schell & Kelly, L.L.P. and George F. Christie, Lee F. Christie, Fort Worth, for appellee.
Before LATTIMORE and DAY, JJ., concur.

OPINION
LATTIMORE, Justice.
Appellants ("Landowners") appeal from an order granting summary judgment in favor of Tarrant County Water Control and Improvement District Number One ("Water District").
We affirm.
This is a suit for damages to land encumbered by flowage easements owned by the Water District. The flowage easements permit the Water District to occasionally flood the Landowners' property without incurring liability. The Landowners purchased their respective tracts of land, predominantly encumbered with flowage easements, with the intent to use the tracts for residential or recreational purposes.[1]
The Landowners filed suit on June 12, 1991 against the Water District, five of the Water District's current and former board members, three title companies, and Ray M. Real Estate, alleging inverse condemnation,[2] misrepresentation, fraud, breach of warranty, negligence, abandonment of the easements, and deceptive trade practices.[3] In their pleadings, the Landowners claimed that during 1989 and 1990 the Water District's use of the flowage easements rendered their land worthless for its intended purpose and diminished the market value of the property. In addition, the Landowners prayed for just compensation for the taking or damaging of real and personal property, costs, attorneys' fees, and injunctive relief. In response, the Water District denied liability under the terms of the flowage easements. The Water District also counterclaimed for declaratory judgment, seeking a determination of the validity of the easements. Subsequently, all claims against the title companies and Ray M. Real Estate were either dismissed or non-suited.
On August 23, 1993, the Water District and its board members filed respective motions for summary judgment, alleging several affirmative defenses that denied the Landowners recovery of damages as a matter of law. The Landowners filed a response to both motions. The summary judgment evidence consisted entirely of affidavits and certified copies of public records. Summary judgment was rendered in favor of the Water District and its directors, however; the Landowners appeal solely from the order granting summary judgment in favor of the Water District.

FACTUAL BACKGROUND
Construction of the Eagle Mountain Lake Dam and Reservoir was completed in the late 1920's.[4] Thereafter, the reservoir reached *445 the planned conservation pool elevation depth of 649 feet above mean sea level ("m.s.l."). The dam is a multipurpose dam designed for flood control, water conservation and reclamation, and protection of fish, wildlife, and surrounding terrain. As such it is operated so as to generally maintain the several purposes in balance, recognizing that from time to time one or another of the purposes will become paramount relative to the others. Before the reservoir's closure, the Water District purchased fee simple title to lands lying above the dam rising to an elevation of 668 feet m.s.l. The Water District then leased the land between 649 to 668 feet m.s.l. to individuals who, in many instances, constructed homes or cabins on the land.
Before September 1, 1975, the Water District offered many of the previously leased tracts for sale to the general public. As the tracts were sold, the Water District reserved flowage easements in the original deeds. In return for the flowage easements, the Water District offered the tracts at a discounted value, presumably to compensate for the diminished difference in the fair market value of the land before compared to after reservation of the easements. The Landowners were informed of the prospects of flooding, which were supposedly diminished by the improvements made to the dam. According to the Landowners, these assurances encompassed non-dam source or natural flooding from the Trinity River.
Since the original public offering, floodwater has exceeded the reservoir's conservation pool level of 649 feet m.s.l. only four times: in 1974, 1981, 1989, and 1990. The 1989 and 1990 floods are the occurrences that triggered this lawsuit. In June of 1989, the Eagle Mountain Lake watershed received substantial rainfall. As a result, on June 14, 1989, Eagle Mountain Lake peaked at a flood level of 652.75 feet m.s.l. The next year, the rainfall in late April and early May of 1990 was considerably more severe. As a result, Eagle Mountain Lake reached a peak flood elevation of 657.09 feet m.s.l. on May 4, 1990.[5] Combined, the 1989 and 1990 floods resulted in more than twenty days in which the water level exceeded the "normal" conservation pool level. Both floods raised the water level enough to inundate the Landowners' property, including several houses. Neither flood exceeded the scope of the flowage easements.

CONTENTIONS OF THE PARTIES
In nine points of error, the Landowners contend the trial court erred in granting summary judgment in favor of the Water District because the flowage easements are invalid, or in the alternative, if valid, the Water District failed to prove any affirmative defense that bars the Landowners' inverse condemnation and negligence claims as a matter of law; and because material issues of fact exist that preclude the granting of summary judgment.
The Water District responds that it is not liable for the claims asserted by the Landowners because: (1) the flowage easements are valid; (2) the inverse condemnation claims under article I, section 17 of the Texas Constitution and the Fifth Amendment to the United States Constitution are precluded by the release of claims clause in the deeds; (3) the "taking" claim under 42 U.S.C. § 1983 is not ripe; and (4) the negligence claims are barred as a matter of law by the doctrines of governmental immunity, contributory negligence, assumption of the risk, and force majeure. The Water District further contends there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.

STANDARD OF REVIEW
The function of summary judgment practice is not to deprive a litigant of his right to trial by jury, but to eliminate patently unmeritorious claims and untenable defenses. *446 Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, 931 (1952). When reviewing a summary judgment granted on general grounds, the court considers whether any theories set forth in the motion will support the summary judgment. State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 380 (Tex. 1993). Because the summary judgment order in this case does not state the specific grounds upon which it was granted, appellants must show that each of the independent arguments alleged in the motion is insufficient to support the order if they are to prevail on appeal. See Sipes v. Petry & Stewart, 812 S.W.2d 428 (Tex.App.San Antonio 1991, no writ); McCrea v. Cubilla Condominium Corp., 685 S.W.2d 755, 757 (Tex. App.Houston [1st Dist.] 1985, writ ref'd n.r.e).
In a summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. See Tex. R.Civ.P. 166a(c); Cate v. Dover Corp., 790 S.W.2d 559, 562 (Tex.1990); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex.1979). In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence will be disregarded and the evidence favorable to the non-movant will be accepted as true. Montgomery v. Kennedy, 669 S.W.2d 309, 311 (Tex.1984); Farley v. Prudential Ins. Co., 480 S.W.2d 176, 178 (Tex.1972). Evidence that favors the movant's position will not be considered unless uncontroverted. Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex.1965).
Our initial inquiry focuses on the validity of the flowage easements since the resolution of that issue is critical to the remainder of our analysis. Thereafter, we will discuss the remaining summary judgment issues.

DEED CONSTRUCTION
In their first point of error, the Landowners contend the trial court erred in granting summary judgment in favor of the Water District because the flowage easements contained in the deeds are invalid and void as against public policy. The Landowners argue that a provision that allows for occasional flooding of their property conflicts with deed restrictions that limit land use to one single-family residence per tract.[6] Contrary to the Landowners' position, we find no such conflict. In reaching this conclusion, we look primarily to rules of deed construction.

1. Rules of Construction
The rules applicable to the construction of deeds also apply to the construction of easements. Jones v. Fuller, 856 S.W.2d 597, 602 (Tex.App.Waco 1993, writ denied); Boland v. Natural Gas Pipeline Co., 816 S.W.2d 843, 844 (Tex.App.Fort Worth 1991, no writ). In construing a deed, the primary duty of a court is to ascertain the intent of the parties by a fundamental rule of construction known as the "four corners" rule. Luckel v. White, 819 S.W.2d 459, 461 (Tex.1991); Cherokee Water Co. v. Forderhause, 641 S.W.2d 522, 524 (Tex.1982); Garrett v. Dils, Co., 157 Tex. 92, 299 S.W.2d 904, 906 (1957). In so doing, the court is not looking for the subjective intent of the parties, which is conflicting and in fact creates an ambiguity in the language of the instrument; instead, it is the objective intent, the intent expressed or apparent in the writing that is sought. Cherokee, 641 S.W.2d at 525; City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex.1968).
In seeking to ascertain the intention of the parties, the court must attempt to harmonize all parts of the deed. Altman v. Blake, 712 S.W.2d 117, 118 (Tex.1986). Even if different parts of the deed appear contradictory or inconsistent, the court must strive to construe the instrument to give effect to all of its provisions. Luckel, 819 S.W.2d at 462; Benge v. Scharbauer, 152 Tex. 447, 259 *447 S.W.2d 166, 167 (1953). A provision in a deed is not invalid, therefore, merely because it conflicts with other provisions. Instead, the test is whether there is an irreconcilable conflict where one part of the instrument destroys in effect another part of it. Benge, 259 S.W.2d at 167.
According to the Landowners, the flowage easements are invalid because they conflict with the Landowners' fee simple ownership rights and their use of the property for single-family residential purposes. All but one[7] of the flowage easements read in part:
There is further excepted and reserved from this Deed and from the lands conveyed hereby an easement in Grantor [Water District] in connection with its operation of Eagle Mountain Lake to cause water to enter or stand upon said land to the extent that said lands are located or contained in areas lying below Elevation 668 feet above mean sea level, and all incidental damages to the lands of Grantee arising from the use of said easement for the flow and storage of water shall be borne by the Grantee, his successors and assigns.
The recorded plat and dedication of the Water Board-Dunaway Subdivision where all but three of the Landowners' properties are located also contains similar language. From this language, we conclude the Water District intended to create an easement by express grant. When the intent of the grantor is clear, as here, neither the trial court nor this court can ignore the rights created by the express grant. Jones, 856 S.W.2d at 602. We next consider whether public policy will uphold the easements in light of their purpose and use.
2. Purpose and Use of Easement
An easement is an interest in land and carries with it some right to use, or benefit from, the land for a specified purpose. See Coughran v. Nunez, 133 Tex. 303, 127 S.W.2d 885 (1939); Gollinger v. State, 834 S.W.2d 553, 555-56 (Tex.App.Houston [14th Dist.] 1992, no writ). A proper construction of the terms of the grant, considered in the light of attending circumstances, determines the purpose or extent of the right of use of an easement. Jones, 856 S.W.2d at 603; Kearney & Son v. Fancher, 401 S.W.2d 897, 905 (Tex.Civ.App.Fort Worth 1966, writ ref'd n.r.e.). The express purpose of the Water District's easement is "to cause water to enter or stand upon said land to the extent that said lands are located or contained in areas lying below Elevation 668 feet above mean sea level...." Through a release of claims clause, the Water District is permitted to flood the Landowners' property without incurring liability.
The Landowners concede their knowledge of the easements but argue that they did not contemplate the potential ramifications underlying their use. Upon reviewing the deeds as a whole, we find no irreconcilable conflict between the easement and the deed restriction. Clearly, the easements do not preclude the Landowners from developing or transferring ownership rights in the property. Indeed, the property can and has been put to productive use for long periods of time with infrequent interruption. In this respect, the flowage easements serve their intended purpose with minimal interference with ownership rights. The Landowners put forth no summary judgment evidence to contradict what appears to be a completely logical, necessary, and mutually agreeable reservation of rights.
Since the early 1900's, this State has focused extensive resources toward water conservation. To that end, entities like the Water District were created to a large extent in response to public demand and in recognition of the State's duty to prevent floods, or at least to take steps necessary for the conservation of natural resources. See Tex. Const. art. XVI, § 59 (interpretive commentary). Accordingly, public policy strongly favors the Water District's use of the flowage easements when reasonable and necessary to carry out its purposes. For these reasons, we hold the Water District's flowage easement is valid. Point of error one is overruled.

*448 INVERSE CONDEMNATION
In their third point of error, the Landowners argue that even if the Water District's flowage easements are valid, use of the easements constituted a taking without just compensation in violation of article I, section 17 of the Texas Constitution and the Takings Clause of the Fifth Amendment to the United States Constitution. Contrary to the Water District's position, the shield of sovereign immunity does not necessarily preclude recovery under inverse condemnation. State v. Biggar, 848 S.W.2d 291, 294-95 (Tex. App.Austin 1993), aff'd, 873 S.W.2d 11 (Tex.1994). We will therefore address the merits of the Landowners' constitutional claim.

1. Texas Constitution
Article I, section 17 of the Texas Constitution provides in part that no person's property is to be taken for or applied to public use without adequate compensation being made, unless by the consent of such person. Tex. Const. art. I, § 17. In order to recover under the theory that property has been taken under this statute, one must establish that the governmental entity intentionally performed certain acts that resulted in a "taking" of one's property for public use. Kite v. City of Westworth Village, 853 S.W.2d 200, 201-02 (Tex.App.Fort Worth 1993, writ denied); Woodson Lumber Co. v. City of College Station, 752 S.W.2d 744, 746-47 (Tex. App.Houston [1st Dist.] 1988, no writ). Whether a "taking" has occurred under inverse condemnation is a question of law. Waddy v. City of Houston, 834 S.W.2d 97, 102 (Tex.App.Houston [1st Dist.] 1992, writ denied).
Under Texas law, a "taking, damage, or destruction" for inverse condemnation purposes is defined as physical appropriation or invasion of property, or unreasonable interference with a landowner's right to use and enjoy the property. DuPuy v. City of Waco, 396 S.W.2d 103, 108-09 (Tex.1965); Allen v. City of Texas City, 775 S.W.2d 863, 865 (Tex.App.Houston [1st Dist.] 1989, writ denied). After reviewing the summary judgment evidence, we conclude the Landowners cannot claim a "taking" of their property within the meaning of article I, section 17 of the Texas Constitution.
The evidence shows that by using the flowage easements, the Water District intentionally caused water to physically invade the Landowners' property. However, considering the minimal amount of time (only four times in twenty years) during which the easements affected use and enjoyment of the Landowners' property, the limited nature of the interference with the use and enjoyment, the Landowners' productive use of the property in the interim, and the Landowners' prior knowledge of the easements, we hold that the easements do not constitute a "taking" under the Texas Constitution. In our opinion, proof evidencing the mere enforcement of an existing easement does not rise to the level of a "taking" under these circumstances.[8]See Arrington v. Mattox, 767 S.W.2d 957, 958 (Tex.App.Austin 1989), cert. denied, 493 U.S. 1073, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990) (holding no taking occurred where court was merely enforcing an already existing public easement).

2. Federal Constitution
Inverse condemnation is also a valid federal claim under the Fifth Amendment to the United States Constitution. By statute, private property shall not be taken for public use without just compensation. U.S. Const. amend. V.; see Samaad v. City of Dallas, 940 F.2d 925, 936-37 (5th Cir.1991). It is well settled that flooding may result in a taking. E.g., Pumpelly v. Green Bay & Mississippi Canal Co., 80 U.S. (13 Wall.) 166, 181, 20 L.Ed. 557 (1871). However, such taking claims must be decided on the particular facts of each case, Herriman v. United States, 8 Cl.Ct. 411, 417 (1985); Berenholz v. *449 United States, 1 Cl.Ct. 620, 626 (1982), aff'd mem., 723 F.2d 68 (Fed.Cir.1983), and must be resolved through reason in light of common sense and experience. Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332, 343 (1979).
Under federal law, the critical element of an inverse condemnation taking in a flooding case is that of "inevitable recurring floods." Singleton v. United States, 6 Cl.Ct. 156, 162 (1984). In other words, government-induced flooding must be intermittent, frequent, and inevitably recurring to constitute a compensable taking, otherwise it is merely a consequential injury or a tort. See, e.g., United States v. Cress, 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746, 753 (1917); Herriman, 8 Cl.Ct. at 417; Cooper v. United States, 8 Cl.Ct. 253 (1985); Singleton, 6 Cl.Ct. at 162; Amick v. United States, 5 Cl.Ct. 426, 429-30 (1984); Barnes v. United States, 210 Ct.Cl. 467, 474-75, 538 F.2d 865, 870 (1976); Hartwig v. United States, 202 Ct.Cl. 801, 809-10, 485 F.2d 615, 619-20 (1973). Therefore, flooding that can be characterized as a random occurrence, not inevitably recurring, does not amount to a taking of property. Also significant to the equation is the issue of whether the flooding was in excess of the flowage easement. Proof of damage alone will not suffice to prove a taking. Loesch v. United States, 227 Ct.Cl. 34, 44, 645 F.2d 905, 914, cert. denied, 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981). In this case, if the facts show that the Water District's authorized operation of the dam caused intermittent, frequent, and inevitably recurring flooding in excess of the scope of the flowage easement, a taking was effected.
A flowage easement is limited by law to the language of the easement and by reasonable use, i.e., not a total use such as would destroy all remaining economic uses of the Landowners' property. Hendricks v. United States, 14 Cl.Ct. 143, 149 (1987). Other than their argument that the flowage easement is inconsistent with a deed restriction, the Landowners offer no evidence of total destruction of their remaining property interest. Instead, their expert in hydrology and hydraulics focuses in his affidavit on the reasonableness of the Water District's gate operating policy and whether the Water District diverged from that policy during the 1989 and 1990 floods. While the expert disputes the Water District's theory that the floods were unprecedented, the affidavit fails to show that the Landowners suffered any compensable damage as a result. There is also no evidence indicating whether the floods were inevitably recurring. It is undisputed, however, that the 1989 and 1990 flood events, generated by substantial rainfall into the Eagle Mountain Lake watershed, produced the damages for which claim is now made. However, the case law is well settled that one, two, or even three floods by themselves do not constitute a taking by inverse condemnation. See Hartwig, 202 Ct.Cl. at 809-10, 485 F.2d at 620; National By-Products, Inc. v. United States, 186 Ct.Cl. 546, 576, 405 F.2d 1256, 1273 (1969); B Amusement Co. v. United States, 148 Ct.Cl. 337, 341-42, 180 F.Supp. 386, 389 (1960); North Counties Hydro-Electric Co. v. United States, 138 Ct.Cl. 380, 382-83, 151 F.Supp. 322, 323, cert. denied, 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957). While the Landowners may well have experienced an unfortunate result of temporary flooding on their property, the fact remains that the flowage easements do not preclude transfer, development, or even productive use of the property. For those reasons, we hold the flowage easements do not constitute a taking under the Fifth Amendment to the United States Constitution.[9] Point of error three is overruled.

SOVEREIGN IMMUNITY AND THE TEXAS TORT CLAIMS ACT
In addition to their inverse condemnation claim, the Landowners complain they suffered damage as a direct result of the Water District's negligent use of the flowage easements. In their second, fourth, and sixth points of error, the Landowners claim that *450 genuine issues of material fact exist concerning whether the Water District used the easements in a reasonable, necessary, and lawful manner, and that the Water District's affirmative defense of sovereign immunity is waived under the Texas Tort Claims Act. Without reaching the merits of the Landowners' negligence claims, we conclude the Texas Tort Claims Act provides no such waiver of immunity.

1. Governmental Immunity
Sovereign immunity shields governmental entities from tort liability, including protection from suit for the vicarious acts of their agents or employees acting in the scope of their employment. Those governmental entities immune from suit include statutorily created special purpose districts like the Water District. See Hodge v. Lower Colorado River Auth., 163 S.W.2d 855, 856 (Tex.Civ.App.Austin 1942, writ dism'd by agr.). Therefore, in the absence of statutory waiver, sovereign immunity is a viable defense to claims against the Water District grounded in tort law.

a. Liability for Governmental Functions
The most well recognized and comprehensive statutory exceptions to sovereign immunity are found within chapter 101 of the Texas Civil Practice and Remedies Code, the Texas Tort Claims Act ("TTCA"). The TTCA defines in detail those instances when a "governmental unit" is subject to waiver of its sovereign immunity.[10] In keeping with the common law, the TTCA's applicability is determined in large part on the function of the governmental unit as either "proprietary" or "governmental."[11]
The Water District, as a water control and improvement district, is a political subdivision created under article XVI, section 59 of the Texas Constitution. Tex. Water Code Ann. § 51.011 (Vernon 1988).[12] As an agency of State government, the Water District can only do that which is authorized by the statute creating it. Franklin County Water Dist. v. Majors, 476 S.W.2d 371, 373 (Tex.Civ.App.Texarkana 1972, writ ref'd n.r.e.); Lower Nueces River Water Supply Dist. v. Cartwright, 274 S.W.2d 199, 207 (Tex.Civ.App.San Antonio 1954, writ ref'd n.r.e.). For that reason, the Water District serves only governmental functions. See Bennett v. Brown County Water Improvement Dist. No. 1, 153 Tex. 599, 272 S.W.2d 498, 499 (1954); Hodge, 163 S.W.2d at 856. One such function of the Water District is to provide for the control, storage, preservation, distribution, conservation, and reclamation of water, including floodwater. Tex. Water Code Ann. § 51.121(b)(1), (3) (Vernon 1988). It may also control, abate, or change any shortage or harmful excess of water. Tex. Water Code Ann. § 51.121(b)(5) (Vernon 1988). Not surprisingly, as the facts of this case illustrate, the Water District is given authority to acquire easements considered *451 necessary, incident, or helpful to accomplish their purposes. Tex. Water Code Ann. §§ 51.122 & 51.123(b), (c) (Vernon 1988).
Because the Water District engages solely in governmental functions, it is subject to waiver of its sovereign immunity under the TTCA. However, this waiver is limited to three general areas, only one of which is relevant to our discussion. According to the TTCA, the Water District is subject to liability, i.e., sovereign immunity is waived, for property damage caused by the wrongful act or omission or the negligence of an employee acting within the scope of his employment if (a) the property damage arises from the operation or use of motor-driven equipment, and (b) the employee would be personally liable to the claimant according to Texas law. Tex.Civ.Prac. & Rem.Code Ann. § 101.021(1) (Vernon 1986).
In their pleadings, the Landowners alleged that the Water District negligently failed to take reasonable preventative measures to minimize potential flood damage to the property surrounding Eagle Mountain Lake and failed to operate the Eagle Mountain Lake and Lake Bridgeport system so as to prevent flooding. According to the Landowners, these willful and negligent acts arose from the operation or use of motor-driven equipment: the Eagle Mountain Lake floodgates. However, the term "motor-driven equipment" as defined in the TTCA does not apply to equipment used in connection with the operation of floodgates or water release equipment. See Tex.Civ.Prac. & Rem.Code Ann. § 101.001(3)(A) (Vernon 1986). Accordingly, the Water District is immune from liability for these particular negligence claims.

b. Liability for Discretionary Functions
The Landowners further claim the Water District is under an obligation, in light of the prospects for heavy rain, to pre-release water from the reservoir, and that the Water District's written floodgate operating policy miscalculates the acceptable floodstage level for Eagle Mountain Lake. They further allege that the Water District deviated from this policy during the 1989 and 1990 floods. The Landowners classify such actions as discretionary functions subject to waiver of governmental immunity. An exception to waiver is the discretionary function exemption found in section 101.056 of the TTCA, which provides that the waiver provisions of the TTCA do not apply to claims based on:
(1) the failure of a governmental unit to perform an act that the unit is not required by law to perform; or
(2) a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit.
Tex.Civ.Prac. & REM.CODE. ANN. § 101.056 (Vernon 1986). See generally, Lee M. Larkin, Comment, The "Policy Decision" Exemption of the Texas Tort Claims Act: State v. Terrell, 32 Baylor L.Rev. 403 (1980) (interpreting original Tort Claims Act codified in the Texas Civil Practice and Remedies Code without substantive change).
The discretionary function exception to the waiver of governmental immunity is designed to avoid judicial review of governmental policy decisions. State v. Terrell, 588 S.W.2d 784, 787 (Tex.1979); Mitchell v. City of Dallas, 855 S.W.2d 741, 745 (Tex.App. Dallas 1993), aff'd, 870 S.W.2d 21 (Tex.1994); McKinney v. City of Gainesville, 814 S.W.2d 862, 866 (Tex.App.Fort Worth 1991, no writ). Thus, a governmental unit is immune from liability if damage or injury results from the formulation of policy. In contrast, a governmental unit is not immune if damage or injury is caused by the negligent implementation of that policy. See Terrell, 588 S.W.2d at 787-88; Mitchell, 855 S.W.2d at 745; Christilles v. Southwest Texas State Univ., 639 S.W.2d 38, 42 (Tex.App.Austin 1982, writ ref'd n.r.e.), overruled on other grounds by, City of Dallas v. Mitchell, 870 S.W.2d 21, 23 (Tex.1994). In other words, actions taken at the planning or policy-making level are immune, whereas actions taken at the subordinate or operational level are not immune. See McKinney, 814 S.W.2d at 866; Tarrant County Water Control & Improvement Dist. No. 1 v. Crossland, 781 S.W.2d 427, 433 (Tex.App.Fort Worth 1989, writ denied).
Floodgate and water release operation at Eagle Mountain Lake is governed by *452 policies and procedures adopted by the Water District's board of directors in 1972. According to these policies, the Water District does not engage in pre-release of water from Eagle Mountain Lake in anticipation of above average inflows. Instead, all spillways remain closed until the water elevation reaches or exceeds 649.1 feet m.s.l. At that point, a portion of the spillway is opened to accommodate the increased water inflow. In the event the water elevation reaches or exceeds 654 feet m.s.l., additional floodgates are opened. Because inflows into Eagle Mountain Lake can exceed outflows during severe weather conditions, the Water District maintains flowage easements to 668 feet m.s.l. on land contiguous to the reservoir in the event circumstances dictate impounding water in excess of the normal water elevation.
We hold that the decision whether to release or pre-release water from the Eagle Mountain Lake spillway constitutes policy formulation for which the Water District is immune from liability. Once the decision to release water is made, however, the subordinate decision of determining the volume of outflow constitutes policy implementation. It appears from the Landowners' pleadings that their complaints focus primarily on the Water District's decision to impound excess water, i.e., not to release water from the spillway in 1989 and 1990, thereby requiring the storage of water on the Landowners' property via the easements. We hold the Water District's decision to impound excess water was a policy decision that constitutes an exception to the waiver of immunity under the TTCA. Therefore, the Landowners are precluded from recovery under the TTCA, even if the decision to impound water was negligent. See Mitchell, 855 S.W.2d at 745. Points of error two, four, and six are therefore overruled.
Based on our resolution of points one through four and six, we need not address the Landowners' remaining points of error.
Accordingly, the judgment of the trial court is affirmed.
NOTES
[1] The Landowners' deeds contain restrictions that limit development to one single-family residence per tract.
[2] The Landowners alleged a claim of a taking without just compensation of the economic remainder of land encumbered with flowage easements.
[3] The Landowners failed to assign error, or to brief, several grounds for which the trial court could have granted summary judgment in favor of the Water District. Such grounds include misrepresentation, fraud, breach of warranty, abandonment of the easements, and deceptive trade practices. The Landowners also did not designate a "Malooly" point of error: "THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR SUMMARY JUDGMENT." Malooly Bros. Inc. v. Napier, 461 S.W.2d 119, 121 (Tex.1970). For these reasons, we will not address on appeal those grounds not specifically challenged by the Landowners. See Rodriguez v. Morgan, 584 S.W.2d 558, 559 (Tex.Civ.App. Austin 1979, writ ref'd n.r.e.).
[4] Improvements were made to the dam in the early 1970's, which included construction of a side channel spillway to improve flood control. The reservoir lies in the middle of a chain of three lakes on the West Fork of the Trinity River. The most upstream lake in the chain is Lake Bridgeport, which is also owned and operated by the Water District. Lake Worth lies downstream and is owned and operated by the City of Fort Worth. Below Lake Worth, which has a fixed spillway, lies the Fort Worth floodway, a system of levees, sumps, gates, and other improvements straddling the Trinity River throughout metropolitan Fort Worth.
[5] The 1990 flood peaked just short of the magnitude of a 100-year flood. A 100-year flood is one of such volume and magnitude that it is expected to occur an average of only once every 100 years. In other words, such a flood has only a one percent chance of occurring in any particular year.
[6] The Landowners concede that the deeds themselves are unambiguous. Accordingly, the construction of the unambiguous deeds is a question of law for the court. See Altman v. Blake, 712 S.W.2d 117, 118 (Tex.1986); White v. White, 830 S.W.2d 767, 769 (Tex.App.Houston [1st Dist.] 1992, writ denied).
[7] The deed of Thomas and Mary Jane Micallef actually contains more descriptive language detailing the scope of the Water District's flowage easement. However, it will suffice to analyze the general easement language contained in the remaining deeds.
[8] Even were we to find the flowage easements constitute a "taking" of the Landowners' property, we would nevertheless find consent. The summary judgment evidence shows the original grantees purchased the property at a discount from market value to compensate for the easement, and thereby consented to the taking. Therefore, the Landowners would not be entitled to compensation because they claim title through these original grantees. See City of Round Rock v. Smith, 687 S.W.2d 300, 303 (Tex.1985).
[9] In a related issue, the Landowners pled a 42 U.S.C. § 1983 claim. An essential element of that claim is the deprivation of a right, privilege, or immunity guaranteed by the United States Constitution, federal law, or both. However, our conclusion that no such right was violated in this case (i.e., no taking) forecloses the Landowners' section 1983 claim.
[10] The TTCA actually modifies the sovereign immunity of governmental entities by providing a limited waiver of immunity to suits against a "governmental unit." A water control and improvement district is defined as a governmental unit under the TTCA. Tex.Civ.Prac. & Rem.Code Ann. § 101.001(2)(B) (Vernon Supp.1995).
[11] A "governmental function" is an activity that is carried out as an arm of the state for the purpose of serving the general public. See City of Houston v. Southwest Concrete Constr. Inc., 835 S.W.2d 728, 730 (Tex.App.Houston [14th Dist.] 1992, writ denied). As a general rule, sovereign immunity applies to governmental functions. See Tex.Civ.Prac. & Rem.Code Ann. §§ 101.001-.027 (Vernon 1986 & Supp.1995). However, the TTCA provides a non-exclusive list of activities that as a matter of law are "governmental" in function, but that may give rise to liability under the Act.

A "proprietary function" is a function or activity that is not required of a governmental unit by law and is not an integral part of being an arm of the state. See City of Fort Worth v. George, 108 S.W.2d 929, 931 (Tex.Civ.App.Fort Worth 1937, writ ref'd). The sovereign immunity of the state does not protect a governmental entity from liability for actions taken in a proprietary capacity because such actions are undertaken for the benefit of private enterprise or the local community rather than for the benefit of the general public. See id.
[12] Water control and improvement districts may also be created under article III, section 52 of the Texas Constitution, which allows a county or other political subdivision to issue bonds or levy taxes for the construction and maintenance of pools, lakes, reservoirs, dams, canals and waterways for the purposes of irrigation, drainage, or navigation. See Tex. Const. art. III, § 52(b)(2).