COURT OF APPEALS






COURT OF APPEALS
EIGHTH DISTRICT OF 
TEXAS
EL PASO, TEXAS
 

 
 
 
  
 KYUNG PARK, SUNGHEE PARK, AND PIOLA 
 SERVICES, L.L.C.,
  
                             
 Appellants,
  
 v.
  
 THE CITY OF SAN ANTONIO,
  
                             
 Appellee.
 
  
 '
    
 '
    
 '
    
 '
    
 '
    
  ' 
  
 
  
  
                   
 No. 08-06-00102-CV        
  
 Appeal from 
 the
  
 224th District 
 Court 
  
 of Bexar 
 County, Texas 
  
 (TC# 
 2000-CI-15114) 
  
 
O P I N I O 
N
 
Appellants 
Kyung Park; his wife, Sunghee Park; and Piola Services, L.L.C. (Appellants will 
be referred to collectively as APark@) filed the underlying 
lawsuit against  the City of San Antonio (Athe City@), alleging negligence, 
gross negligence, and inverse condemnation.  The trial court granted 
partial summary judgment in favor of the City on Park=s negligence and gross 
negligence claims.  Following a bench trial, the court also granted 
judgment in the City=s 
favor on Park=s 
inverse condemnation claim.  Park now appeals the judgments on each of the 
causes of action.  For the reasons that follow, we affirm.
                                 
FACTUAL AND PROCEDURAL BACKGROUND

Dr. Park and 
his wife formed Piola Services, L.L.C. between 1994 and 1995 to develop 
seventeen acres of real property, located at 7667 Potranco Road in San Antonio, 
as a golf driving range, club house, and batting cages.[1]  When Park 
first became interested in the property, it was zoned for single- and 
multi-family residential use.  In August 1995, at Park=s request, the City 
re-zoned the property to include a provision for specific business use as a golf 
driving range.[2]  The 
property abuts a residential neighborhood.
Park began to 
develop the property following the zoning approval.  In March 1996, the 
City approved the facility site plan, and building began.  The City issued 
building permits throughout the development process, including permits for the 
clubhouse, batting cages, and driving range.  The site plan which the City 
approved included plans to build high fences made out of netting along the sides 
of the property as part of the driving range.  The finished barriers were 
twenty to twenty-five feet high along the back of the property, and fifty feet 
high along the sides.  There is no record of a building permit issued 
specifically for the fences, but the City issued a Certificate of Occupancy for 
the business, including the fences, in September 1996.
Park 
testified that, from the facility=s first days, the driving 
range was the major source of income.  Not long after the driving range 
opened, however, Park began getting complaints from the residents of the 
neighborhood that golf balls were landing in their backyards.  In response 
to the complaints, Park raised the net fence along the property line which the 
driving range shared with the residential lots to forty feet.  Park did not 
notify the City when he raised the netting.

In May 1997, 
a severe storm caused the poles supporting the net barrier to break, and the 
netting fell onto the driving range.  Park applied for a permit to replace 
the broken wooden poles with steel, so that another storm would not knock the 
net down again.  The City=s Director of Building 
Inspections denied the repair permit and recommended that Park apply to the 
Board of Adjustment for a variance and permit to make the repairs to the, now, 
forty-foot high fence.
Prior to the 
time when Park requested the re-zoning, the City=s zoning and building 
regulations had been compiled into the AUniform Development 
Code@ (AUDC@).  Under the UDC, 
fences were not permitted to exceed six feet in height, without a 
variance.  Gene Camargo, the City=s Director of Building 
Inspections until January 2001, testified that he believed that the height of 
the fence was simply overlooked when the original building site plan was 
approved and again when the Certificate of Occupancy was issued.  Camargo 
also testified that, because Park never applied for a permit specifically for 
the fence, the City was not aware of the fence height violation until Park 
applied for a permit to make repairs.
After 
Park=s request for a 
zoning variance to allow the extra fence height was denied by the Board of 
Adjustment, he appealed the decision to the district court.  The district 
court remanded the case to the Board of Adjustment for reconsideration.  
After the Board of Adjustment again refused to grant the variance, Park gave up 
on pursuing the driving range business.  Park was forced to tear down the 
driving range fence and close that part of the facility.  Without the 
income from the driving range, the business faltered, and it was eventually 
foreclosed and sold.  Park testified that he did not investigate the market 
value of the property following the variance denial and never attempted to 
market the property for alternative development.
Park filed 
this lawsuit on October 17, 2000, alleging that the City was negligent and 
grossly negligent by re-zoning the property, because it failed to warn Park 
about the UDC restrictions on fence height.  Park also asserted a claim for 
inverse condemnation under article I, section 17 of the Texas Constitution, 
alleging that the City=s regulations constituted a 
Ataking@ of the property for public 
use.

The City 
filed a hybrid motion for summary judgment on Park=s negligence and gross 
negligence claims, arguing, in part, that there was not an applicable waiver of 
sovereign immunity.  The trial court granted the City=s motion for summary 
judgment as to negligence and gross negligence.  The liability elements of 
the inverse condemnation claim were tried to the court without a jury.  
Following the bench trial, the trial court entered judgment in favor of the City 
on the inverse condemnation claim.  Park appeals both judgments.
In Issue One, 
Park contends the trial court improperly granted summary judgment as to his 
negligence and gross negligence claims.  In Issue Two, Park challenges the 
trial court=s judgment 
in the City=s favor on 
his claim for inverse condemnation.
DISCUSSION
In Issue One, 
Park contends that the trial court erred in granting summary judgment in favor 
of the City on his negligence and gross negligence causes of action.  The 
standards for reviewing summary judgments are well established.  Western 
Invs., Inc. v. Urena, 162 S.W.3d 547, 550 (Tex. 2005).  When, as in 
this case, the trial court does not specify the basis for its ruling, it is the 
appellant=s burden on 
appeal to show that each of the independent grounds asserted in support of 
summary judgment is insufficient to support the trial court=s ruling.  See 
Star-Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995); Lee v. Levi 
Strauss & Co., 897 S.W.2d 501, 504 (Tex. App.--El Paso 1995, no 
writ).  If the appellant fails to challenge one of the grounds asserted for 
summary judgment, the judgment may be affirmed on that ground alone.  
Star-Telegram, 915 S.W.2d at 473; Humane Soc=y v. Dallas Morning News, 
L.P., 180 S.W.3d 921, 923 (Tex. App.--Dallas 2005, no pet.).

The City=s motion for summary 
judgment on Park=s 
negligence and gross negligence causes of action included eight separate 
grounds.  The first ground challenged Park=s ability to establish that 
he had satisfied the notice requirement under the Texas Tort Claims Act (ATTCA@), which is a prerequisite 
to suing a governmental unit.  See Tex. Civ. Prac. & Rem. Code Ann. 
' 101.101.  
The City also asserted that Park failed to identify a waiver of its protection 
from suit under the doctrine of sovereign immunity.[3]  The 
remainder of the City=s grounds challenged the 
evidence in support of the merits of Park=s negligence and gross 
negligence causes of action and argued that the City is immune from liability 
for exemplary damages and attorney=s fees.
In its order 
granting the City=s 
motion, the trial court stated:
The court 
finds that the [City] is entitled to summary judgment on its requests for 
summary judgment on [Park=s] causes of action for 
Negligence and Gross Negligence.  The court finds that [Park] has not 
provided sufficient evidence to raise a genuine issue of material facts on these 
causes of action and that [the City] is entitled to summary judgment as a matter 
of law.
 
Park argues 
that the trial court did not grant summary judgment based on governmental 
immunity, and he expressly chose not to address those grounds for summary 
judgment in his brief to this Court.  Park reads the trial court=s order too narrowly.  
While the summary judgment order does specify that the court granted the 
City=s motion only as 
to the negligence and gross negligence causes of action, it does not specify 
upon which ground or grounds the court did so.

In a suit 
against a governmental unit, such as the City of San Antonio, a plaintiff bears 
the burden of complying with the notice requirements of the TTCA, as well as of 
pleading and proving an express waiver of sovereign immunity.  See 
Tex. Civ. Prac. & Rem. Code 
Ann. ' 101.101; 
see also Dallas Area Rapid Transit v. Whitley, 104 S.W.3d 540, 542 (Tex. 
2003) (in a suit against a governmental unit, the plaintiff must affirmatively 
demonstrate a valid waiver of immunity).  Without an express waiver of 
sovereign immunity, the trial court lacks subject matter jurisdiction over the 
lawsuit.  Texas Dep=t of Transp. v. Jones, 
8 S.W.3d 636, 638 (Tex. 1999).  Lack of subject matter jurisdiction due to 
sovereign immunity can be raised in several ways, including by a motion for 
summary judgment.  Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 
554 (Tex. 2000).
Because the 
trial court did not specify the ground upon which it granted summary 
judgment,  the burden falls on Park to show that each of the grounds 
asserted by the City was insufficient to support the order.  Lee, 
897 S.W.2d at 504.  Since Park has not addressed at least two potential 
grounds in his argument to this Court, we affirm the trial court=s order on that basis, even 
if there were no other bases.[4]  See 
Humane Soc=y, 180 S.W.3d at 
923.  Accordingly, we overrule Issue One.

In Issue Two, 
Park challenges the trial court=s entry of judgment in 
favor of the City on his claim for inverse condemnation.[5]  A 
landowner may, pursuant to article I, section 17 of the Texas Constitution, 
bring an inverse condemnation claim when his property has been taken, damaged, 
or destroyed for, or applied to, public use, without adequate 
compensation.  Berry v. City of Reno, 107 S.W.3d 128, 133 (Tex. 
App.--Fort Worth 2003, no pet.).  The Texas Constitution provides that no 
person=s property is 
to be taken or applied to public use without adequate compensation=s being made, unless by the 
consent of such person.  See Tex. Const. art. I, ' 17.  The constitution 
thereby waives governmental immunity from suit and creates liability A>for the taking, damaging 
or destruction of property for public use.=@  City of Houston 
v. Boyle, 148 S.W.3d 171, 177 (Tex. App.--Houston [1st Dist.] 2004, no pet.) 
(citing Steele v. City of Houston, 603 S.W.2d 786, 788-92 (Tex. 
1980)).  To state a cause of action for inverse condemnation under the 
Texas Constitution, a claimant must allege (1) an intentional governmental act; 
(2) that resulted in his property=s being taken, damaged, or 
destroyed; (3) for public use.  Little-Tex Insulation, 39 S.W.3d at 
598.  Whether the facts of a particular case are sufficient to constitute a 
taking is a question of law.  Id.  We review questions of law 
de novo.  State v. Heal, 917 S.W.2d 6, 9 (Tex. 
1996).

A Ataking@ can take the form of a 
physical invasion of property or a regulation which imposes some limitation on 
how the property can be used.  Lowenberg v. City of Dallas, 168 
S.W.3d 800, 801 (Tex. 2005) (per curiam).  There are Aseveral sharp distinctions 
between physical takings and regulatory takings.@  Id.  
Physical takings are Arelatively rare, easily 
identified, and usually represent a greater affront to individual property 
rights.@  
Id. at 801-02 (citing Tahoe-Sierra Preservation Council, Inc. v. Tahoe 
Reg=l Planning 
Agency, 535 U.S. 302, 324, 122 S. Ct. 1465, 1479 (2002)).  In contrast, 
regulatory takings Aare ubiquitous and most of 
them impact property values in some tangential way.@  Id. (citing 
Tahoe-Sierra, 535 U.S. at 324).
 There 
are also analytical distinctions between different categories of regulatory 
takings.  A regulatory taking that causes the property owner to suffer a 
Aphysical 
invasion@ of his 
property gives rise to a right to compensation without a fact-specific analysis 
of the surrounding circumstances.  See Sheffield Dev. Co. v. City of 
Glenn Heights, 140 S.W.3d 660, 671 (Tex. 2004) (quoting Lucas v. South 
Carolina Coastal Council, 505 U.S. 1003, 1015, 112 S. Ct. 2886 
(1992)).  A property owner also suffers a taking when a regulation Adenies all economically 
beneficial or productive use of land,@ which effectively denies 
the owner of the property itself.[6]  
Id.  This second circumstance is limited to Athe extraordinary 
circumstance when no productive or economically beneficial use of land is 
permitted.@  
Id. (citing Tahoe-Sierra, 535 U.S. at 330) (emphasis in 
original).  Determining whether a regulation has destroyed all economically 
viable uses of the property involves only the simple inquiry as to whether the 
restriction renders the property valueless.  Mayhew v. Town of 
Sunnyvale, 964 S.W.2d 922, 935 (Tex. 1998), cert. denied, 526 U.S. 
1144, 119 S. Ct. 2018 (1999).  The mere fact that a regulation has 
destroyed the most profitable use of property does not establish a compensable 
taking.  See Taub v. City of Deer Park, 882 S.W.2d 824, 826 (Tex. 
1994).

Finally, a 
compensable regulatory taking can occur when a regulation unreasonably 
interferes with the property owner=s right to use and enjoy 
the property.  Mayhew, 964 S.W.2d at 935.  The case before us 
falls in this third category of regulatory takings cases.  Park argues that 
the City=s regulation 
caused him to lose one of the economically beneficial uses of the property B indeed, to Park, its most 
economically beneficial use B to wit, the driving 
range.  When a takings claim is based on an allegation that a regulation 
has destroyed only some of the property=s value, through a 
restriction which only affects one or some of its economically viable uses, the 
court must examine the totality of the relevant circumstances and balance the 
public and private interests.  See Sheffield Dev. Co., 140 S.W.3d at 
672.
For guidance 
in this fact-specific analysis, we apply the three factors identified in Penn 
Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124, 98 S. Ct. 2646, 
2659 (1978).  The Penn Central factors are:  (1) Athe economic impact of the 
regulation on the claimant@; (2) Athe extent to which the 
regulation has interfered with distinct investment-backed expectations@; and (3) Athe character of the 
governmental action.@   Sheffield 
Dev. Co., 140 S.W.3d at 672 (citing Connolly v. Pension Benefits Guar. 
Corp., 475 U.S. 211, 225, 106 S. Ct. 1018 (1986) (quoting from Penn 
Central, 438 U.S. at 124)).  These factors are not exclusive and are 
not to be applied as a formulaic test.  Id. (citing 
Tahoe-Sierra, 535 U.S. at 326-27 n.23).  They serve merely as Aimportant guideposts that 
lead to the ultimate determination whether just compensation is required.@  Id.  
That question turns on Awhether the burden of 
regulation ought >in all fairness and 
justice= to be borne 
by the public.@ 
Id. at 672-73 (quoting City of Austin v. Teague, 570 S.W.2d 389, 
393 (Tex. 1978)).

We will begin 
by considering the economic impact of the City=s re-zoning of Park=s property.  See 
Sheffield Dev. Co., 140 S.W.3d at 677.  While the government does not 
guarantee the profitability of each parcel of land subject to its authority, the 
value of the property and the severity of the economic impact on the property 
owner are both relevant factors to consider.  Id.  In assessing 
the value of the property and the severity of the economic impact on the 
property owner, we can also consider evidence of both lost investment and lost 
development profits.  Id.
Park argues 
there is no evidence to prove that another use of the property was possible, 
making the economic hardship imposed by the regulation all the more 
severe.  According to Park=s testimony, however,  
the batting cages, putting green, and clubhouse continued to operate for nearly 
a year without the driving range, before the business closed.  The record 
also shows that, subsequent to the foreclosure, the clubhouse has been used as a 
church, and the City has built a five-million gallon water tank on the 
site.  Park admitted at trial that, following the Board of Adjustment=s final decision denying 
the variance, he did not attempt to market the property for alternative 
development.[7]  All this 
evidence indicates that the property retained at least some value without the 
driving range.  Because Park did not attempt to sell the property during 
the year after the driving range closed and was therefore not able to testify 
regarding the specific amount of income lost when that occurred, there is no way 
to quantify the value lost.  While there is little doubt that Park was 
impacted adversely due to the fence height limitation in the regulation, the 
lack of economic information, partly due to Park=s inaction, weighs against 
him in the overall balance of public versus private interest.  See 
id. at 672.

Next, we 
consider whether Park had a reasonable, investment-backed expectation in the 
property.  See id. at 677.  In a regulatory taking case, the 
injury which gives rise to a right to compensation is caused by the passage of 
the ordinance that injures the property=s value or 
usefulness.  See Lowenberg, 168 S.W.3d at 802.  The existing 
and permitted uses of the property constitute the primary expectation of the 
landowner that is affected by the regulation.  Mayhew, 964 S.W.2d at 
936.  The zoning regulations in place at the time that the property owner 
bought the property are also to be considered.  Id.  As such, 
the historical uses to which the property has been put are Acritically important@ to our analysis.  
Id. at 937.  We may also consider the property owner=s knowledge of the existing 
zoning regulations.  Id. at 936.
Park argues 
that his compliance with the building-permit and site-plan-approval processes, 
as well as the City=s 
numerous inspections of the facility, all indicate he had a reasonable, 
investment-backed expectation to operate the driving range.  Yet, all of 
the actions Park cites as evidence of his reasonable, investment-backed 
expectation took place after the property was re-zoned at his request.
Before Park 
began developing the property, it was a vacant lot and was being used as a local 
dumping ground.  The property did not have a historical use as a driving 
range or as any other commercial venture.  Given the fact that Park was the 
party who initiated the zoning change, before he began developing the property, 
it is fair to assume that he had some knowledge of the zoning regulations and 
restrictions already in place.  Those regulations, including the UDC, 
limited development to residential uses, and they contained fence height 
restrictions.

Park 
understood very early in the development process that high fences were part of 
operating a driving range.  He  testified that, during his driving 
range research, he visited other facilities in Houston and Los Angeles, and, 
because those facilities had high fences, he did not think that a high fence in 
San Antonio would be a problem.  He also testified that he understood that 
the average golfer usually drives a golf ball less than three hundred 
yards.  His driving range was significantly less than three hundred yards, 
but, Park testified, Awith fences we had enough 
coverage.@  
Without the fences, Park could not operate his business.  However, even 
with the new zoning classification, the UDC prohibited fences above six 
feet.  As such, at the time the City re-zoned the property at Park=s request, he did not have 
a reasonable, investment-backed expectation of operating a driving range on the 
property.
Park argues 
that, under the analysis in the San Antonio Court of Appeals= recent opinion in City 
of San Antonio v. El Dorado, 195 S.W.3d 238 (Tex. App.--San Antonio 2006, 
pet. denied), he has suffered a regulatory taking, because, like the property 
owner in El Dorado, the City=s regulatory action (1) 
denied him of all economically viable uses of the property, or (2) unreasonably 
interfered with his right to use and enjoy the property.  In El 
Dorado, our sister court of appeals concluded that the claimant suffered a 
compensable regulatory taking when San Antonio changed the existing zoning 
classification, so that the property could no longer be used as a bar and 
lounge.  Id. at 247.  The court focused much of its factual 
takings analysis on the property=s historical use as a 
bar.  Id. at 246-47.  According to the opinion, the property 
had been used as a bar continuously for eighteen years at the time the city 
re-zoned.  Id.
The facts of 
El Dorado differ from Park=s situation in several 
important respects.  First, that property had an eighteen-year historical 
use before the regulatory change.  Id. at 246-47.  In the case 
before us, the property had no historical use as a driving range at the time of 
the re-zoning.  Second, there is no indication in El Dorado that the 
property owner requested the zoning change.  Indeed, the opinion indicates 
that the city re-zoned the property against the owner=s wishes, in response to a 
Adisturbance@ on the property.  
Id. at 247.  The fact that Park requested the regulatory action for 
which he now wishes to be compensated weighs heavily against the public=s being required to bear 
the economic burden of the regulation.  See Sheffield Dev. Co., 140 
S.W.3d at 673.

Park=s request for the zoning 
change is also important to our consideration of the third Penn Central 
factor, the character of the government=s action.  See id. 
at 678.  In Sheffield Development, the Texas Supreme Court 
expressed concern over the government=s conduct in delaying the 
zoning decision for over a year in order to secure the votes needed to prevent 
the claimant=s 
development.  Id. at 679.  Despite these concerns, however, the 
Court determined that the zoning decision itself, independent of the way it was 
reached, was not so different from other zoning decisions as to constitute a 
taking.  Id.   Similarly, while we would have preferred 
that the City had considered its
own 
fence-height restrictions before approving the zoning change and Park=s site plan, the regulatory 
act itself is not so far outside the zone of reasonableness as to constitute a 
taking, based on this factor alone.
There is no 
doubt that Park=s 
situation is an unfortunate one.  However, having reviewed the totality of 
the facts and circumstances in light of the Penn Central factors, we 
conclude that the City=s actions following the 
re-zoning, which Park requested, were  not ones which should, Ain all fairness and 
justice,@ be paid for 
by the public.  See id. at 672.  Therefore, we hold there was 
no regulatory taking for which Park is entitled to compensation, and we overrule 
Issue Two.  Having overruled both of Appellant=s issues, we affirm the 
trial court=s 
judgment.
 
KENNETH R. 
CARR, Justice
July 19, 2007
 
Before Chew, C.J., McClure, and 
Carr, JJ.




[1]  Kyung Park, M.D., had been a resident of San 
Antonio since the early 1980=s.  From 1982 until 2002, Dr. Park had a private 
neurological practice, also in San Antonio. 

[2]  The San Antonio City Council approved the 
re-zoning as follows:  AThe rezoning and reclassification of property from 
Temporary >R-1= Single Family Residence District and >R-3= Multiple Family Residence District to >R-1= CC Single Family Residence District for a golf driving 
range, and >B-3= Business District and from >R-3= Multiple Family Residence District to >R-3= CC Multiple Family Residence District for a golf 
driving range . . . .@  The City Council approved the zoning request, 
despite a staff recommendation against the change. 

[3]  The TTCA modifies the sovereign immunity of 
governmental entities and provides A[t]he most well recognized and comprehensive statutory 
exceptions to sovereign immunity@ in Texas.  See Bennett v. Tarrant County Water 
Control & Improvement Dist., 894 S.W.2d 441, 450 (Tex. App.--Fort Worth 
1995, writ denied).  Within the Act, however, the legislature expressly 
declined to waive immunity for a governmental unit=s discretionary acts.  See Tex. Civ. Prac. & Rem. Code Ann. 
' 101.056.  This provision is commonly referred to 
as the Adiscretionary function exception.@  See Mitchell v. City of Dallas, 855 S.W.2d 
741, 745 (Tex. App.--Dallas 1993), aff=d, 870 S.W.2d 
21 (Tex. 1994).  The discretionary-function exception to the 
TTCA=s waiver of sovereign immunity is designed to avoid 
judicial review of governmental policy decisions.  Id. at 
745.

[4]  In the interest of justice, we have also reviewed 
the record for evidence of Park=s compliance with the notice requirements of the TTCA, 
as well as any pleadings identifying a waiver of sovereign immunity.  Park 
does not cite us to evidence in the record, and we have been unable to locate 
evidence presented in Park=s summary judgment response, to establish notice 
pursuant to section 101.101 of the Texas Civil Practice and Remedies Code.  

 
We also note that, although he has not addressed the 
issues in his appellate brief, in Park=s summary judgment response, he argued that Athe Texas Tort Claims Act does not apply due to Section 
101.056 of the Texas Civil Practice and Remedies Code.@  Section 101.056 is the legislature=s expression that a governmental unit=s performance or nonperformance of a discretionary act, 
defined as an act which the unit is not required by law to perform, is not 
subject to the waiver of immunity under the TTCA.  See Tex. Civ. Prac. & Rem. Code Ann. 
' 101.056.  Therefore, Park=s statement that the TTCA does not apply to 
discretionary acts is correct.  However, the effect of the exception from 
the TTCA=s limited waiver of sovereign immunity is that the City 
does enjoy immunity from suit for its discretionary acts.  As this 
is the only provision which Park cited as a waiver of sovereign immunity, Park 
did not establish an applicable waiver in this case. 

[5]  Park frames Issue Two in terms of a 
sufficiency-of-the-evidence challenge to the trial court=s findings of fact and conclusions of law.  The 
central issue in this case, according to Park=s argument at trial, is whether the City=s act of re-zoning the property constituted a 
Ataking@ under the Texas Constitution.  Because the takings 
issue is a question of law, we will conduct a de novo review.  
See General Servs. Comm=n v. Little-Tex Insulation Co., 39 S.W.3d 591, 598 (Tex. 2001).

[6] Sheffield Development relied, in part, on the 
United States Supreme Court=s opinion in Agins v. City of Tiburon, 447 U.S. 
255, 260, 100 S. Ct. 2138 (1980), to identify a third circumstance which 
entitled a property owner to compensation for a regulatory taking, without the 
need for a fact-specific analysis.  See Sheffield Dev. Co., 140 
S.W.3d at 671.  In circumstance three, a property owner could prove a 
taking, if the regulation at issue did not Asubstantially advance legitimate state 
interests.@  Id.  Since Sheffield 
Development, the United States Supreme Court has overruled that portion of 
its Agins opinion.  See Lingle v. Chevron U.S.A., Inc., 544 
U.S. 528, 540-41, 125 S. Ct. 2074 (2005).  The Texas Supreme Court has not 
addressed whether the substantial advancement test remains valid for Texas 
Constitutional law purposes in light of Lingle.

[7]  According to Park=s real estate valuation expert, the value of the 
seventeen-acre tract actually increased over the three years that Park owned it, 
from approximately $382,000 to approximately $450,000.  The expert also 
testified that, based on his research, it would have been possible for another 
commercial enterprise to make profitable use of the property.