ACCEPTED
03-15-00292-CV
6671739
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/26/2015 9:51:30 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00292-CV

# IN THE COURT OF APPEALS FOR THE THIRD JUDICIAL DISTRICT OF TEXAS AT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/26/2015 9:51:30 PM
JEFFREY D. KYLE
Clerk

CITY OF AUSTIN,
*Defendant – Appellant*,

v.

JENNIFER FRAME, ET AL.,
*Plaintiffs – Appellees*.

## APPELLEES' BRIEF

**Appeal from the 98th Judicial District Court of Travis County, Texas**
Cause No. D-1-GN-14-004391

Sean E. Breen
State Bar No. 00783715
sbreen@howrybreen.com
HOWRY BREEN & HERMAN, LLP
1900 Pearl Street
Austin, Texas 78705-5408
Tel. (512) 474-7300
Fax (512) 474-8557

Mike Davis
State Bar No. 05549500
mdavis@slackdavis.com
SLACK & DAVIS, L.L.P.
2705 Bee Caves Road, Suite 220
Austin, Texas 78746
Tel. (512) 795-8686
Fax (512) 795-8787

*Attorney for Appellees Jennifer Frame, Greg Griffith, and Cheryl Burris*

*Attorney for Appellee Diana Pulido*

# TABLE OF CONTENTS

Index of Authorities ................................................................................... iii

Statement of the Case .................................................................................. 1

Statement Regarding Oral Argument ........................................................... 2

Issue Presented ............................................................................................ 3

Statement of Facts ....................................................................................... 4

    I.     Colonel Griffith was killed and Ms. Pulido was injured while they were using the City-owned and operated Lady Bird Lake Hike & Bike Trail. .............................................................. 4

    II.    Because there were many previous incidents at the same location on the trail, the City had identified it as a safety hazard. ................................................................................................ 4

    III.   The City's auditor concluded the City's delay in addressing the identified safety hazard on the Hike & Bike Trail was contrary to the City's policy. .................................................... 6

Summary of Argument .................................................................................. 8

Arguments and Authorities ........................................................................... 9

    I.     Legal standards ................................................................................ 9

    II.    Appellees met their burden to allege facts establishing the trial court's subject-matter jurisdiction. ............................................ 10

        A.    The factual allegations in Appellees' first amended petition clearly fall within policy-implementation waiver of governmental immunity. ............................................ 10

        B.    The City's attempt to plead ignorance of the policies at issue is disingenuous. ........................................................ 11

    III.   The trial court's denial of the City's plea to the jurisdiction was correct because the City failed to affirmatively and conclusively negate Appellees' basis for jurisdiction. ........................ 16

        A.    An entity's governmental immunity is waived for harm caused by the failure of policy implementation. ............. 16

        B.    The City itself concluded there was a failure of policy implementation. ......................................................... 18

        C.    The conclusion reached by the City is consistent with

the findings of other Texas appellate courts. ...........................20

D. The City's attempt to characterize its failure to eliminate or control a safety hazard as a discretionary policy-formulation decision misunderstands Texas law. ...............................................................................22

E. The City's insistence that this is a case about roadway design does not make it so, and therefore the City may not raise the defense of governmental immunity......................24

IV. The trial court's decision was also correct because, at a minimum, fact issues exist as to whether the City made a policy-formulation decision and simply failed to implement it. .............................................................................................25

Prayer ..........................................................................................................27

Certificate of Compliance ...........................................................................29

Certificate of Service ..................................................................................30

# INDEX OF AUTHORITIES

*Bellnoa v. City of Austin*, 894 S.W.2d 821 (Tex. App.—Austin 1995, writ denied) ..................................................................................................15

*Bennett v. Tarrant Cnty. Water Ctrl. Dist. No. 1*, 894 S.W.2d 441 (Tex. App.—Fort Worth 1995, writ denied)........................................................23

*City of Austin v. Rangel*, 184 S.W.3d 377 (Tex. App.—Austin 2006, no pet.) ...................................................................................................9

*City of Granite Shoals v. Winder*, 280 S.W.3d 550 (Tex. App.— Austin 2009, pet. denied)................................................................. 9, 16, 26

*City of Midland v. Sullivan*, 33 S.W.3d 1 (Tex. App.—El Paso 2000, pet. dism'd) ................................................................................. 10, 20, 21

*City of Paris v. Floyd*, 150 S.W.3d 224 (Tex. App.—Texarkana 2004, no pet.) ...................................................................................................9

*Fountain v. Burklund*, No. 03-01-00380-CV, 2001 Tex. App. LEXIS 8252 (Tex. App.—Austin Dec. 13, 2001, pet. denied)........................................13

*K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357 (Tex. 2000) ......................................27

*San Patricio Mun. Water Dist. v. City of Corpus Christi*, No. 13-10-00272-CV, 2011 Tex. App. LEXIS 262 (Tex. App.—Corpus Christi Jan. 13, 2011, pet. denied) ..................................................................27

*State Dep't of Highways & Pub. Transp. v. King*, 808 S.W.2d 465 (Tex. 1991)..............................................................................................15

*State v. Lueck*, 290 S.W.3d 876 (Tex. 2009) ........................................................9, 11

*Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653 (Tex. 2007) ............ passim

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440 (Tex. 1993) .................................................................................................9

*Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217 (Tex. 2004) ................................................................................. 9, 10, 16, 26

*Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636 (Tex. 1999) ......................................9

*Tex. Dep't of Transp. v. Hathorn*, No. 03-11-00011-CV, 2012 Tex. App. LEXIS 5906 (Tex. App.—Austin July 19, 2012, no pet.)...........................25

*Wenzel v. City of New Braunfels*, 852 S.W.2d 97 (Tex. App.—Austin 1993, no writ)....................................................................................25

*Zambory v. City of Dallas*, 838 S.W.2d 580 (Tex. App.—Dallas 1992, writ denied), *disapproved on other grounds*, *City of Grapevine v. Sipes*, 195 S.W.3d 689, 695 n.5 (Tex. 2006).................................... 10, 14, 20, 21

# STATEMENT OF THE CASE

**Nature of the case:** Plaintiffs – Appellees Jennifer Frame, individually and as personal representative of the Estate of Colonel John Griffith, Greg Griffith, Cheryl Burris, and Diana Pulido brought negligence claims against Defendant Joseph Rosales and Defendant – Appellant City of Austin for wrongful death and personal injuries that occurred when Mr. Rosales struck Colonel Griffith and Ms. Pulido while both were using the City's Lady Bird Lake Hike & Bike Trail on May 7, 2012.

**Course of proceedings:** Appellees filed suit against Mr. Rosales for negligence on November 12, 2012.[1] Appellees filed their first amended petition on May 7, 2014, and asserted negligence claims against the City.[2] The City asserted a plea to the jurisdiction in its original answer,[3] and a hearing on the City's plea was held on April 13, 2015, before Judge Amy Clark Meachum.

**Trial court disposition:** Judge Meachum denied the City's plea to the jurisdiction on April 27, 2015.[4] The City filed its notice of appeal on May 8, 2015.[5] Mr. Rosales is not a party to this appeal.

---

[1] *See* CR 3.

[2] *See* CR 11.

[3] CR 22.

[4] CR 66.

[5] CR 70.

## STATEMENT REGARDING ORAL ARGUMENT

Appellees agree with the City that oral argument is not necessary for this case.

It presents no new or novel issues, and may be decided under clear Texas law.

# ISSUE PRESENTED

A governmental entity like a city possesses immunity for the ***formulation*** of policy, but immunity is waived for injuries caused by a city's negligent failure to ***implement*** policy. Further, a city's plea to the jurisdiction may only be granted if the pleadings and jurisdictional evidence affirmatively and conclusively negate the existence of jurisdiction.

In this case, Appellees presented, among other evidence, a report from the City's auditor that found that, contrary to specific Parks & Recreation Department policy, the City "delay[ed] in addressing identified safety hazards" on the Lady Bird Lake Hike & Bike Trail at the place where Colonel Griffith was killed and Ms. Pulido was injured.[6]

> *Did the trial court err in denying the City's plea to the jurisdiction when it concluded the City failed to affirmatively and conclusively negate the existence of jurisdiction?*

---

[6] CR 60.

**I. Colonel Griffith was killed and Ms. Pulido was injured while they were using the City-owned and operated Lady Bird Lake Hike & Bike Trail.**

On May 7, 2012, at approximately 5:15 pm, Colonel Griffith was walking with his daughter along the Lady Bird Lake Hike & Bike Trail ("Hike & Bike Trail") on the south side of the 900 block of West César Chávez Street.[7] A vehicle driven by Mr. Rosales entered the curve in the road under the Lamar Boulevard overpass, jumped the curb, and careened down the trail. Debris, a road sign, and Mr. Rosales's vehicle struck Colonel Griffith and another pedestrian, Ms. Pulido.[8] Both Colonel Griffith and Ms. Pulido were severely injured; Colonel Griffith died from his injuries later that night.[9]

**II. Because there were many previous incidents at the same location on the trail, the City had identified it as a safety hazard.**

The City had long ago identified the safety hazard presented by the section of the Hike & Bike Trail where Colonel Griffith and Ms. Pulido were struck. In fact, it had been the site of at least 13 separate collisions in the 15 years preceding this incident.[10] In 1999, then-Governor Bush, on his morning jog, was forced to take

---

[7] CR 13–14.

[8] CR 14.

[9] CR 14.

[10] CR 15–16.

cover behind a bridge support after a trailer overturned and dumped debris across the trail.[11] In a very similar incident in 2006, this danger was exposed again when an inattentive driver jumped the curb heading eastbound on West César Chávez Street and traveled 200 feet down the Hike & Bike Trail before coming to a stop after hitting three trees.[12]

On at least three occasions before Colonel Griffith and Ms. Pulido were struck, concerned citizens contacted the City to request the construction or coordination of safety measures for the express purpose of protecting pedestrians on the Hike & Bike Trail.[13] In response, members of the City's Parks and Recreation Department (the Department) recognized the dangerous condition of the Hike & Bike Trail did not meet the Department's safety standards.[14] Less than two months before this incident, a Department division manager noted that "[safety] concerns kept coming up" about the section of the Hike & Bike Trail where Colonel Griffith and Ms. Pulido were struck.[15]

---

[11] *See* CR 15–16.

[12] *See generally* CR 45–53.

[13] *See* CR 16.

[14] *See* CR 16.

[15] *See* CR 16.

**III. The City's auditor concluded the City's delay in addressing the identified safety hazard on the Hike & Bike Trail was contrary to the City's policy.**

After this incident occurred, a Parks and Recreation Department Patron Safety Audit conducted in February 2014 by the City auditor's office found that "[p]er [Department] policies, when a hazard is identified, it is either corrected by eliminating the cause of the hazard or is effectively controlled, such as controlling or limiting access to a specific area."[16]   In other words, the City's Department had a specific policy in place to eliminate the cause of identified safety hazards or to control the hazards by limiting access to them.[17]

The City auditor's report noted, however, that "hazards identified are not monitored through correction." [18]   In support of this conclusion, the report specifically cited the May 7, 2012 incident in which Colonel Griffith was killed and Ms. Pulido was injured as an example of the Department's delay in addressing an identified safety hazard. [19]   The City's own audit concluded that "[w]hile [Department] management has developed and approved policies aimed at identifying and managing hazards related to patron safety, [Department] executive management has not allocated the appropriate skills, structure, and resources to

---

[16] CR 60.

[17] *See* CR 60; *see also* CR 17 (citing City auditor's report)

[18] CR 56.

[19] CR 60.

support the *implementation* of patron safety policies."[20]

---

[20] *See* CR 56 (emphasis added).

## SUMMARY OF ARGUMENT

Years before Colonel Griffith was killed and Ms. Pulido was injured, the City had identified the portion of the Hike & Bike Trail that approaches West César Chávez Street under Lamar Boulevard as a safety hazard. Despite a policy of eliminating or controlling identified safety hazards, the City's Parks and Recreation Department delayed in addressing this known safety hazard. A February 2014 report from the City auditor's office concluded the City had failed to implement Department policies regarding the elimination or control of safety hazards, specifically citing the incident forming the basis for this case as an example.

Appellees affirmatively established the trial court's subject-matter jurisdiction in both their pleadings and the jurisdictional evidence they submitted through claims that their harm was caused by the City's failure to implement its own policy for which no governmental immunity exists. After Appellees carried their burden, the trial court correctly denied the City's plea to the jurisdiction because the City failed to carry *its* burden to affirmatively and conclusively negate the existence of jurisdiction. In doing so, the trial court recognized the existence of disputed questions of fact that were both material to the court's subject-matter jurisdiction and intertwined with the merits of Appellees' claims.

## ARGUMENTS AND AUTHORITIES

### I.    Legal standards

A plea to the jurisdiction is a challenge to a court's subject-matter jurisdiction.[21] The burden to demonstrate jurisdiction in the first instance is on the plaintiff, which is met by alleging facts affirmatively establishing the trial court's subject-matter jurisdiction.[22]

All of a plaintiff's factual allegations are accepted as true.[23] When evaluating a plaintiff's pleadings, a trial court looks to the plaintiff's intent and construes pleadings establishing the trial court's jurisdiction in the plaintiff's favor.[24]

"Only if the pleadings and jurisdictional evidence affirmatively and conclusively negate the existence of jurisdiction should a plea to the jurisdiction be granted."[25] Disputed evidence of jurisdictional facts may require resolution by the fact finder and prevent a decision on a plea to the jurisdiction.[26]

A denial of a governmental entity's plea to the jurisdiction is reviewed *de*

---

[21] *See, e.g.*, *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638–39 (Tex. 1999).

[22] *See, e.g.*, *State v. Lueck*, 290 S.W.3d 876, 884 (Tex. 2009).

[23] *City of Austin v. Rangel*, 184 S.W.3d 377, 381 (Tex. App.—Austin 2006, no pet.).

[24] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

[25] *City of Granite Shoals v. Winder*, 280 S.W.3d 550, 555 (Tex. App.—Austin 2009, pet. denied).

[26] *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Winder*, 280 S.W.3d at 555; *City of Paris v. Floyd*, 150 S.W.3d 224, 226 (Tex. App.—Texarkana 2004, no pet.).

*novo.*[27]

## II. Appellees met their burden to allege facts establishing the trial court's subject-matter jurisdiction.

As discussed in more detail below, a governmental entity's ***formulation*** of policy is distinct from the entity's ***implementation*** of that policy.[28] The parties agree that a governmental entity retains immunity for deciding on a policy in the first instance, but does not enjoy such immunity for action (or a lack of action) taken to implement that policy.[29] In other words, a governmental entity is not immune if the implementation rule applies. The trial court correctly recognized this as a policy-implementation case and properly denied the City's plea to the jurisdiction.[30]

### A. The factual allegations in Appellees' first amended petition clearly fall within policy-implementation waiver of governmental immunity.

In their first amended petition, Appellees alleged their harm was caused by the City's failure to implement an existing policy:[31]

---

[27] *See Miranda*, 133 S.W.3d at 228.

[28] *See Stephen F. Austin State Univ. v. Flynn*, 228 S.W.3d 653, 657 (Tex. 2007); *City of Midland v. Sullivan*, 33 S.W.3d 1, 15 (Tex. App.—El Paso 2000, pet. dism'd); *Zambory v. City of Dallas*, 838 S.W.2d 580, 582 (Tex. App.—Dallas 1992, writ denied), *disapproved on other grounds*, *City of Grapevine v. Sipes*, 195 S.W.3d 689, 695 n.5 (Tex. 2006).

[29] *Compare* Appellant's Brief, at 14 *with* CR 37 (Appellees' response to the City's plea to the jurisdiction); *see also Flynn*, 228 S.W.3d at 657; *Sullivan*, 33 S.W.3d at 15; *Zambory*, 838 S.W.2d at 582.

[30] CR 66.

[31] *See* CR 17.

> and implement a policy of maintenance and construction of corrections and safeguards to protect patrons was a proximate cause of this incident. This was not an isolated incident. A failure to implement policies has plagued the City of Austin Parks and Recreation Department. In fact, the incident made the basis of this lawsuit was recently cited by the City Auditor as one example of delays by the PARD in addressing identified safety hazards.[1] Addressing identified safety hazards is not discretionary – it is mandatory and ministerial. The report found that PARD is not managing safety hazards effectively and there is limited assurance that hazards are promptly identified and corrected. The failure of the City to act on clear policy in place to protect people such as the Plaintiffs was negligence, gross negligence and a proximate cause of the devastating injuries here and is actionable.
>
> The acts and omissions in this matter and over the course of the previous 13 similar

These allegations (the City's failure to implement a policy led to the Appellees' harm) state a cognizable claim under Texas law, which is not barred by governmental immunity.[32] Appellees therefore met their burden to affirmatively establish the subject-matter jurisdiction of the trial court through their pleadings.[33]

**B.    The City's attempt to plead ignorance of the policies at issue is disingenuous.**

In an attempt to show Appellees have not met their pleading burden, the City argues Appellees have failed to sufficiently identify a policy imposing on the City a

---

[32] *Flynn*, 228 S.W.3d at 658.

[33] *Lueck*, 290 S.W.3d at 884.

duty to act.[34]  In essence, the City argues that Appellees are relying upon a nonexistent policy.  This is incorrect.

First, the City accuses Appellees of alleging a broad fix-all-hazards policy that is not sufficiently specific to impose a ministerial burden on the City to act.[35]  But Appellees are not pointing to a policy that requires the elimination or control of ***all*** unidentified safety hazards throughout Department properties—the policy upon which Appellees rely only addresses hazards the City has previously identified.  Here, the pleadings and jurisdictional evidence show the City had formulated a policy, identified a specific safety hazard pursuant to that policy, but failed to take the necessary steps to implement that policy and thereby eliminate or control the safety hazard.

Second, the City asserts that, even if Appellees are attempting to identify a specific policy that imposes ministerial duties, they have failed to do so.[36]  The City lists in its brief purported requirements for more information regarding the policy at issue: the policy's name, the date it was issued, the period it covers, the policymaker, etc.[37]  The City has waived this argument because it is raising it for the first time on

---

[34] Appellant's Brief, 18–21.

[35] Appellant's Brief, at 14.

[36] Appellant's Brief, at 18–19.

[37] Appellant's Brief, at 4, 19, 20.

appeal—nor did it specially except to Appellees' pleadings in the trial court as insufficiently specific to identify the City policies at issue.[38] Further, even if the City had not waived this argument, it cites no authority in support of its position.

Third and finally, the City auditor's report, which was referenced in Appellees' first amended petition,[39] specifically described the policies that Appellees allege were violated, thereby creating the unsafe environment in which Colonel Griffith was killed and Ms. Pulido was injured:[40]

**3. Hazard correction**

As indicated above, after detection, significant current and potential hazards should be prevented, corrected, or controlled in a timely manner. Per PARD policies, when a hazard is identified, it is either corrected by eliminating the cause of the hazard at the source or is effectively controlled, such as controlling or limiting access to a specific area. However, as shown in Exhibit 2, currently there is no mechanism to ensure that once identified, hazards are actually corrected.

**EXHIBIT 2**
**Implementation of Patron Safety Hazard Correction Policies**

| PARD Policy Requirement | Implemented? | OCA Observations |
|---|---|---|
| The Safety Officer should conduct follow-up inspections to ensure corrective action is taken | No | We found no evidence that routine follow-up is conducted |
| The Safety Office is responsible for monitoring the implementation of the safety program to ensure compliance | No | Documentation needed to evaluate compliance with the safety program is not maintained in a central location |

SOURCE: PARD policies and OCA observations during the course of this audit, September-December 2013

---

[38] *See, e.g.*, *Fountain v. Burklund*, No. 03-01-00380-CV, 2001 Tex. App. LEXIS 8252, at *10 (Tex. App.—Austin Dec. 13, 2001, pet. denied) (failure to file special exceptions to defects in pleadings waives complaint on appeal).

[39] CR 17 n.1.

[40] CR 60.

> Over the course of our audit, we found various instances of delays in addressing identified safety hazards. For example:
>
> - The Annual Playground Conditions Overview Report from November 2012 identified eight playground locations with non-compliant safety hazards that, according to priority ratings established by the International Playground Safety Institute, are "non-compliant safety concerns that may result in permanent disability, loss of life or body part, and should be corrected immediately." As of December 2013, only four of the eight playscapes have had the hazards mitigated. Although the implementation of a new playscape is assigned to the Capital Improvement Planning Division, there appears to be disagreement between this division and the Maintenance Division over what PARD division is responsible for mitigating the existing hazards.
> - A tree fell and injured a park patron on the Town Lake Trail in September 2013; PARD had identified the tree for removal a month prior.
> - The Occupational Health and Safety Coordinator asserted that he has identified safety hazards at multiple PARD locations, but due to disagreement with PARD division managers over the severity of the hazard, action was not taken to mitigate the hazard.
> - One person was killed, and another seriously injured, when a car jumped the curb on the Town Lake Trail in May 2012. A temporary guardrail was installed at the location and remains today. It is unclear when a decision will be made regarding safety at the location. In 1999, the Governor was injured at the same location.

This description of the Department's policies referenced by the City auditor's report was sufficiently specific for Sara Hensley, director of the Department, to confirm that she agreed with the report's recommendations.[41] In fact, Ms. Hensley's adoption of the City auditor's findings as the Department's director should effectively dispose of the City's argument that the policy relied upon by Appellees is merely an "employee report."[42]

It is, at best, misleading for the City to state that the Department's response to the City auditor's report does not mention the accident or the accident site.[43] As the

---

[41] CR 64.

[42] Appellant's Brief, at 21 (citing *Zambory*, 838 S.W.2d at 538).

[43] Appellant's Brief, at 5, 14.

City well knows—and as shown in the screenshot above—not only does the City auditor's report itself specifically mention the accident and the accident site,[44] but the response from Ms. Hensley, the Department's director, acknowledges that she reviewed the report's findings and recommendations *and agreed with them*.[45]

Further, the City's reliance on *Bellnoa v. City of Austin* is misplaced.[46] In *Bellnoa*, this Court concluded that the two documents relied upon by the plaintiffs imposed no duty on the City because (i) one was specifically found *not* to be mandatory by the Texas Supreme Court four years earlier,[47] and (ii) the other explicitly called itself a set of "guidelines."[48] In contrast, the City auditor's office in this case referred to the policies cited in its February 2014 report as having "*requirements* for hazard identification, data analysis, and hazard correction and monitoring."[49] This characterization of the Department's policies was adopted by Ms. Hensley, the Department's director.[50]

---

[44] CR 60.

[45] CR 64.

[46] Appellant's Brief, at 19–20 (citing *Bellnoa v. City of Austin*, 894 S.W.2d 821, 824 (Tex. App.—Austin 1995, writ denied)).

[47] *Bellnoa*, 894 S.W.2d at 824 (citing *State Dep't of Highways & Pub. Transp. v. King*, 808 S.W.2d 465, 466 (Tex. 1991)).

[48] *Id.* at 824–25.

[49] CR 56 (emphasis added).

[50] CR 64.

In sum, Appellees met their burden to affirmatively demonstrate the trial court's jurisdiction because they pleaded claims for injuries caused by the City's negligent failure to implement specific Department policies and presented jurisdictional evidence of the same. The City's attempt to feign ignorance of the policies at issue is not supported by Appellees' pleadings or the jurisdictional evidence presented to the trial court below.

## III. The trial court's denial of the City's plea to the jurisdiction was correct because the City failed to affirmatively and conclusively negate Appellees' basis for jurisdiction.

Once a plaintiff has alleged facts that affirmatively establish the trial court's subject-matter jurisdiction over a claim, the burden shifts to the entity asserting governmental immunity to affirmatively and conclusively negate the existence of jurisdiction.[51] In this sense, the evaluation of a governmental entity's plea to the jurisdiction is not unlike consideration of a traditional motion for summary judgment under Rule 166a(c) of the Texas Rules of Civil Procedure.[52]

### A. An entity's governmental immunity is waived for harm caused by the failure of policy implementation.

In response to Appellees' proper pleading of a claim for which the City possesses no governmental immunity, the City contends that the action (or inaction)

---

[51] *Winder*, 280 S.W.3d at 555.

[52] *Miranda*, 133 S.W.3d at 228; *Winder*, 280 S.W.3d at 555.

at issue is one of policy *formulation*, not policy *implementation*, and therefore the City's governmental immunity remains intact. This Court should reject this contention for the reasons set forth below.

The Texas Supreme Court has recognized there are multiple tests under Texas law to determine whether a governmental entity's actions constitute the formation of policy or the implementation of policy: (1) the policy/operational test, which compares policy decisions to subordinate decisions, and (2) the design/maintenance test, which protects an entity's initial design decisions but not the decisions made once the design has been installed.[53] The determination of whether a governmental entity's actions constitute policy formulation or policy implementation is a question of law.[54]

As an example, in *Stephen F. Austin State University v. Flynn*, a woman was knocked off of her bicycle by an oscillating sprinkler while riding along a path on the university's campus.[55] The university argued that the design of its irrigation system (i.e., where to place sprinklers and how to run them) was a discretionary decision for which it was immune.[56] The Texas Supreme Court rejected that

---

[53] *Flynn*, 228 S.W.3d at 657.

[54] *Id.* at 657.

[55] *Id.* at 655.

[56] *Id.* at 657.

argument, finding that the decisions on when and where to spray water were operational- or maintenance-level decisions for which the university was not immune.[57]

In this case, the policy decision at issue is the Department's stated policy of eliminating or controlling identified hazards.[58] Appellees have alleged and provided evidence that the City identified the section of the Hike & Bike Trail that passes under Lamar Boulevard as a safety hazard for its users and that the City's failure to eliminate or control this safety hazard was a negligent failure to implement the City's stated policy.[59]

### B. The City itself concluded there was a failure of policy implementation.

The City itself reached the same conclusion in the City auditor's report from February 2014:[60]

**WHAT WE FOUND**

While PARD management has developed and approved policies aimed at identifying and managing hazards related to patron safety, PARD executive management has not allocated the appropriate skills, structures, and resources to support the implementation of its patron safety policies.

---

[57] *Flynn*, 228 S.W.3d at 658.

[58] *See* CR 60.

[59] CR 17, 60.

[60] CR 56 (first image), 60 (second image).

**3. Hazard correction**

As indicated above, after detection, significant current and potential hazards should be prevented, corrected, or controlled in a timely manner. Per PARD policies, when a hazard is identified, it is either corrected by eliminating the cause of the hazard at the source or is effectively controlled, such as controlling or limiting access to a specific area. However, as shown in Exhibit 2, currently there is no mechanism to ensure that once identified, hazards are actually corrected.

**EXHIBIT 2**
**Implementation of Patron Safety Hazard Correction Policies**

| PARD Policy Requirement | Implemented? | OCA Observations |
|---|---|---|
| The Safety Officer should conduct follow-up inspections to ensure corrective action is taken | No | We found no evidence that routine follow-up is conducted |
| The Safety Office is responsible for monitoring the implementation of the safety program to ensure compliance | No | Documentation needed to evaluate compliance with the safety program is not maintained in a central location |

SOURCE: PARD policies and OCA observations during the course of this audit, September-December 2013

Over the course of our audit, we found various instances of delays in addressing identified safety hazards. For example:

The report even used the language approved by the Texas Supreme Court in *Flynn* that there was a failure of "implementation."

It is difficult to imagine more dispositive evidence that an entity's action or inaction was the result of policy implementation than a report from the entity's audit office stating "executive management has not allocated the appropriate skills, structures and resources to support the ***implementation*** of its patron safety *policies*."[61] This is direct and compelling evidence from the City itself that Colonel Griffith's death and Ms. Pulido's injuries resulted from the City's failure to implement a policy that was in place to prevent just such an occurrence. Thus, the

---

[61] CR 56 (emphasis added).

trial court correctly denied the City's plea to the jurisdiction.

### C. The conclusion reached by the City is consistent with the findings of other Texas appellate courts.

The City's own characterization of its actions (a failure to implement policy) is actionable and Appellees' ability to assert their claims is supported by the decisions of other Texas appellate courts concluding that a city department's failure to take action regarding a decision already reached constitutes the negligent implementation of a discretionary decision for which there is no governmental immunity.[62] In *Zambory v. City of Dallas*, a bicyclist was struck at an intersection that did not have a traffic signal.[63] Before the incident, concerned citizens had repeatedly contacted the city's transportation department about the lack of a signal, spoken at city council meetings, and warned the city that signs at the intersection were inadequate.[64] A day before the bicyclist was injured, a Dallas city council member stated on the record that a temporary signal needed to be installed, but no motion was made and no vote was taken.[65] The Dallas court of appeals reversed the trial court's grant of summary judgment on immunity grounds, finding that a fact

---

[62] *See City of Midland v. Sullivan*, 33 S.W.3d 1, 15 (Tex. App.—El Paso 2000, pet. dism'd); *Zambory*, 838 S.W.2d at 582.

[63] *Zambory*, 838 S.W.2d at 581–82.

[64] *Id.* at 583.

[65] *Id.* at 581–82.

issue existed on whether the city had formulated policy by deciding that the intersection was dangerous and that a temporary signal was necessary, but had simply failed to implement it.[66]

In *City of Midland v. Sullivan*, a student was struck in a crosswalk after a school zone sign did not activate in time for early-morning classes.[67] The El Paso court of appeals held that the city's initial decision to establish a school zone and its hours of operation were discretionary, but the city's failure to keep the parameters of the school zone accurate and current (like the school zone sign) was a negligent implementation of the city's own policy and prior determination.[68]

Just as in *Zambory* and *Sullivan*—which were presented in Appellees' briefing in the trial court below[69] but not distinguished or even discussed in the City's appellate brief—the City in this case had:

- an existing policy (to eliminate or control identified safety hazards);

- identified a safety hazard (the danger posed to users of the Hike & Bike Trail near the intersection of West César Chávez Street and Lamar Boulevard); and

- negligently failed to implement its own policy (delayed in addressing identified safety hazards).

---

[66] *See Id.* at 583.

[67] *See Sullivan*, 33 S.W.3d at 5.

[68] *See id.* at 15.

[69] CR 38–40.

Under *Flynn*, *Zambory*, and *Sullivan,* these actions establish a waiver of the City's governmental immunity for Colonel Griffith's death and Ms. Pulido's injuries.

**D.      The City's attempt to characterize its failure to eliminate or control a safety hazard as a discretionary policy-formulation decision misunderstands Texas law.**

Retreating somewhat, the City attempts to distinguish *Flynn* by claiming no policy-formulation decision was ever made and points to a sentence in the City auditor's report that says: "It is unclear when a decision will be made regarding safety at that location."[70] The City misunderstands Appellees' arguments and the contents of its own auditor's report.

As noted earlier, the policy-*formulation* decision at issue is the Department's policy of eliminating or controlling identified safety hazards, and the policy-*implementation* decision (or lack thereof) is how to go about eliminating or controlling the identified hazard.[71] The City's failure to eliminate or control an identified safety hazard referenced in the City auditor's report ("It is unclear when a decision will be made regarding safety at that location.") was a policy-*implementation* decision, not the absence of a policy-*formulation* decision. The

---

[70] Appellant's Brief, at 13 (citing CR 17, 60).

[71] *See* CR 38 ("The Policy decision at issue is the Austin Parks and Recreation Department's stated policy of correcting or controlling identified hazards.  The failure to make the section of the Hike & Bike Trail that passes under Lamar Boulevard safe for its users, after the hazard was identified, was a negligent failure to implement stated policy.")

Texas Supreme Court reached the same conclusion in *Flynn*: the university's decision to irrigate the campus was one of policy formulation, and its decision to operate the irrigation system during peak periods of public use was one of policy implementation.[72]

The City next claims that, even if a policy-formulation decision occurred, the follow-up decision **not** to implement safety measures was another discretionary one for which the City is still immune: "If addressing safety hazards is a discretionary policy decision, then so is determining the best way to go about doing so."[73] This argument was implicitly rejected in *Flynn*.[74]

There, the Supreme Court approved the reasoning of the Fort Worth court of appeals in *Bennett v. Tarrant County Water Control & Improvement Dist. No. 1* when it stated that "the decision to release water from a spillway constitutes policy formulation for which the water district is immune, but that the subordinate decision of determining the volume of the outflow is policy implementation for which the district is not immune."[75] In other words, simply because an action involves choice does not make it "discretionary" so as to preserve governmental immunity.

---

[72] *Flynn*, 228 S.W.3d at 657–58.

[73] Appellant's Brief, at 22.

[74] *Flynn*, 228 S.W.3d at 657.

[75] *Id.* at 657 (citing *Bennett*, 894 S.W.2d 441, 452 (Tex. App.—Fort Worth 1995, writ denied)).

Under *Flynn*, the City's decision on how to eliminate or control an identified safety hazard (where the Lady Bird Lake Hike & Bike trail approaches West César Chávez Street under the Lamar Boulevard overpass) is no different than a decision on the volume of water to release through a spillway: both constitute the *implementation* of an earlier policy-formulation decision.

### E. The City's insistence that this is a case about roadway design does not make it so, and therefore the City may not raise the defense of governmental immunity.

This case is not pleaded as a roadway-design case nor can the City amend Appellees' pleadings to make it so. As demonstrated above, both the pleadings and evidence presented by Appellees complain of the City's failure to implement stated policies of the Parks and Recreation Department, not the design of West César Chávez Street. Despite the factual allegations in Appellees' pleadings and the arguments Appellees made in the trial court, the City continues to attempt to amend Appellees' pleadings by insisting that Appellees are actually complaining of roadway design and, therefore, the City is immune for such decisions.

The cases cited by the City in an attempt to characterize Appellees' cause of action as a complaint regarding roadway design are inapplicable and distinguishable. In *Texas Department of Transportation v. Hathorn*, for example, this Court granted a plea to the jurisdiction after concluding the plaintiffs' complaints were "based

- 24 -

entirely on TxDOT's roadway design."[76] This decision was largely because the

plaintiffs' expert witnesses had offered opinions critical of the roadway's design.[77]

No such evidence exists in this case.

In *Wenzel v. City of New Braunfels*, the city's plea to the jurisdiction was

granted because this Court concluded the plaintiffs were challenging the city's

decision to regulate traffic near the fairgrounds.[78] There is no mention of any

allegations in the *Wenzel* opinion that the city had made a decision to implement

traffic control or safety measures and had failed to do so, as there are in this case.[79]

In sum, the City's arguments and evidence are insufficient to *persuade* this

Court that Appellees' harm was caused by a discretionary decision like policy

formulation, much less *affirmatively and conclusively* establish such a proposition.

For this reason, the trial court correctly denied the City's plea to the jurisdiction.

## IV. The trial court's decision was also correct because, at a minimum, fact issues exist as to whether the City made a policy-formulation decision and simply failed to implement it.

Even if a city asserts and supports with evidence that the trial court lacks

subject-matter jurisdiction, a plea to the jurisdiction should not be granted if disputed

---

[76] No. 03-11-00011-CV, 2012 Tex. App. LEXIS 5906, at *23 (Tex. App.—Austin July 19, 2012, no pet.).

[77] *Hathorn*, 2012 Tex. App. LEXIS 5906, at *21–23.

[78] *Wenzel v. City of New Braunfels*, 852 S.W.2d 97, 99–100 (Tex. App.—Austin 1993, no writ).

[79] *See* CR 16–17.

material facts exist regarding the jurisdictional issue in question and that issue is intertwined with the merits of the case.[80] This protects plaintiffs from being required to put on their entire case simply to establish subject-matter jurisdiction.[81]

A large portion of the City's brief consists of allegations that are actually disputed material facts, such as its contention that there is no policy compelling the City to eliminate or control identified safety hazards exists.[82] Or its argument that, even if such a policy did exist, the City had made no decision on what to do if a safety hazard was identified at the location where Colonel Griffith was killed and Ms. Pulido was injured.[83] These disputed facts are material to both a waiver of governmental immunity (whether the harm to Appellees was caused by a failure of policy implementation, which, by definition, requires the existence of a "policy") and the merits of Appellees' case (whether the City is liable to Appellees for negligently failing to eliminate or control identified safety hazards).

The trial court did not specify the basis for its decision to deny the City's plea to the jurisdiction.[84] In such a situation, an appellate court will affirm if any of the

---

[80] *Miranda*, 133 S.W.3d at 228; *Winder*, 280 S.W.3d at 561–62.

[81] *Miranda*, 133 S.W.3d at 228; *Winder*, 280 S.W.3d at 562.

[82] Appellant's Brief, at 4, 16, 18–21.

[83] Appellant's Brief, at 4, 10, 13, 16, 21–22.

[84] CR 66.

grounds presented to the trial court are meritorious.[85]  Appellees specifically asserted in the trial court that disputed jurisdictional facts should bar the City's plea to the jurisdiction.[86]  This ground was presented to the trial court, may have been relied on by the trial court in denying the City's plea to the jurisdiction, and, therefore, may serve as basis for an order from this Court affirming the trial court's decision.[87]

## PRAYER

On May 7, 2012, the day of the incident, the City's Parks and Recreation Department had already identified the location on the Hike & Bike Trail where Colonel Griffith was killed and Ms. Pulido was injured as a safety hazard.  This is not supposition by Appellees: according to the City auditor's report, the City failed to "allocate[] the appropriate skills, structures, and resources to support implementation of its patron safety policies."  This was a failure of policy implementation under Texas law, which means the City may not hide behind governmental immunity.

Plaintiffs – Appellees Jennifer Frame, individually and as personal

---

[85] *See San Patricio Mun. Water Dist. v. City of Corpus Christi*, No. 13-10-00272-CV, 2011 Tex. App. LEXIS 262, at *8 (Tex. App.—Corpus Christi Jan. 13, 2011, pet. denied); *see also K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) ("Because the trial court did not specify the ground on which it [ruled], we will affirm the trial court's ruling if any ground is meritorious.").

[86] *See* CR 17, 40–42.

[87] *See San Patricio Mun. Water Dist.*, 2011 Tex. App. LEXIS 262, at *8; *Honeycutt*, 24 S.W.3d at 360.

representative of the Estate of Colonel John William Griffith, Greg Griffith, Cheryl Burris, and Diana Pulido therefore respectfully request an order affirming the trial court's decision to deny the City's plea to the jurisdiction, and for such other and further relief to which they may be justly entitled.

Dated: August 26, 2015

Respectfully submitted,

HOWRY BREEN & HERMAN, LLP

_____
Sean E. Breen
State Bar No. 00783715
sbreen@howrybreen.com
1900 Pearl Street
Austin, Texas 78705-5408
Tel. (512) 474-7300
Fax (512) 474-8557

*Attorneys for Plaintiffs – Appellees*
*Jennifer Frame, Greg Griffith, and*
*Cheryl Burris*

Mike Davis
State Bar No. 05549500
mdavis@slackdavis.com
SLACK & DAVIS, L.L.P.
2705 Bee Caves Road, Suite 220
Austin, Texas 78746
Tel. (512) 795-8686
Fax (512) 795-8787

*Attorneys for Plaintiff – Appellee*
*Diana Pulido*

## CERTIFICATE OF COMPLIANCE

As required by Rule 9.4(e) of the Texas Rules of Appellate Procedure, I certify this is a computer-generated document created in Microsoft Word 2013, using 14-point typeface for all text, except for any footnotes, which are in 12-point typeface.

As required by Rule 9.4(i)(3), I certify that this brief contains 4,688 words, not including the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare this document.

_____
Sean E. Breen

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was delivered on August 26, 2015, in compliance with Rules 9.5(b) of the Texas Rules of Appellate Procedure, to the parties listed and in the manner indicated below.

Karen M. Kennard, City Attorney
Meghan L. Riley, Chief, Litigation
Chris Edwards, Assistant City
Attorney
chris.edwards@austintexas.gov
City of Austin-Law Department
P.O. Box 1546
Tel. (512) 974-2419
Fax (512) 974-1311

✓ Electronic service
☐ In person
☐ Registered mail, return receipt requested
☐ Commercial delivery service
☐ Facsimile
✓ Electronic mail

*Attorneys for Defendant – Appellant*
*City of Austin*

_____
Sean E. Breen

No. 03-15-00292-CV

---

**IN THE COURT OF APPEALS FOR THE
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN, TEXAS**

---

CITY OF AUSTIN,
*Defendant – Appellant*,

v.

JENNIFER FRAME, ET AL.,
*Plaintiffs – Appellees*.

---

# APPELLEES' APPENDIX

---

| Tab | Description | CR Range |
|-----|-------------|----------|
| 1 | Appellees' first amended petition | 11–21 |
| 2 | Parks and Recreation Department Patron Safety Audit conducted in February 2014 | 54–65 |

# TAB 1

CAUSE NO. D-1-GN-12-003557

| | | |
|---|---|---|
| JENNIFER FRAME, INDIVIDUALLY, AND | § | IN THE DISTRICT COURT OF |
| AS PERSONAL REPRESENTATIVE OF THE | § | |
| ESTATE OF JOHN WILLIAM GRIFFITH, | § | |
| GREG GRIFFITH, CHERYL BURRIS and | § | |
| DIANA PULIDO | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| THE CITY OF AUSTIN AND JOSEPH | § | |
| LOUIS ROSALES | § | 53rd JUDICIAL DISTRICT |

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, JENNIFER FRAME, Individually and as Personal Representative of the Estate of John William Griffith, GREG GRIFFITH, CHERYL BURRIS and DIANA PULIDO ("Plaintiffs") and file this Original Petition against The City of Austin ("City") and Joseph Louis Rosales ("Rosales"), and in support thereof, would show the Court the following:

### DISCOVERY CONTROL PLAN

Discovery shall be conducted under Level 3 pursuant to Rule 190 of the Texas Rules of Civil Procedure. The damages to the parties in the case exceed a million dollars.

### PARTIES

Plaintiff, JENNIFER FRAME, is an individual residing in Austin, Travis County, Texas.

Plaintiff, GREG GRIFFITH, is an individual residing in Austin, Travis County, Texas

Plaintiff, CHERYL BURRIS, is an individual residing in Plano, Texas.

Plaintiff, DIANA PULIDO, is an individual residing in Austin, Travis County, Texas.

-1-

11

Defendant CITY OF AUSTIN, is a home rule municipality existing under the laws of the State of Texas, and may be served, pursuant to Tex. Civ. Prac. & Rem. Code § 17.024, by serving its City Secretary at 301 West 2nd Street, Austin, Texas.

Defendant, JOSEPH LOUIS ROSALES, is an individual residing in Austin, Texas and has been served and appeared through his attorney, Virginia Isabel Hermosa, Hermosa Law Firm, 503 West 17th Street, Suite 200, Austin, Texas 78701.

Jennifer ("Jenny") Frame ("Frame") is the Personal Representative of the Estate of Decedent Colonel (Ret.) John William Griffith and Greg and Cheryl are the son and daughter of Col. John Griffith. In her representative capacity as Personal Representative for Griffith's Estate, Frame brings this survival action on behalf of the estate of John William Griffith for survival damages, including pre-death terror and pain, medical bills and funeral bills that his estate incurred as a result of the tragic but avoidable incident described below. In addition, as the Personal Representative for the Estate, Frame also brings this suit to recover damages for the pain, suffering, and mental anguish that John William Griffith sustained as a result of his injuries and prior to his death.

In addition, Jennifer Frame, Cheryl Burris and Greg Griffith are daughters and the son of Col. John William Griffith, and, as such, they are proper statutory wrongful death beneficiaries under Texas Civil Practice and Remedies Code § 71.004. The Frames bring this wrongful death suit in their individual capacity as the daughters and son of Col. John William Griffith for all the damages properly recoverable in a wrongful death suit.

In addition, Jennifer Frame was bystander and an eye witness to the fatal incident in which her father was killed in the incident described below. Frame brings this suit in her

individual capacity for the bystander damages and mental anguish that she has sustained as the result of being a bystander to the incident that caused her father's fatal injuries.

Diane Pulido suffered serious and permanent injuries as a result of this incident and brings suit to recover her damages under applicable Texas law.

## JURISDICTION, VENUE AND NOTICE

This court has subject matter jurisdiction over this action. Venue is proper in Travis County, Texas because, among several things, Travis County is where the incident occurred. Plaintiff alleges that the damages sustained by Plaintiffs in each capacity greatly exceed the minimal jurisdictional threshold limits of this Court. Plaintiffs have given all required notices to bring this action. Prior to the filing of this lawsuit, and within the time period prescribed from the date of the occurrence described in this petition, Plaintiffs presented notice of their claim to the proper representative of the City of Austin as required. Additionally, at all relevant times, Defendant City of Austin has had actual notice of Plaintiffs' injuries and damages through actual notice, as, e.g., the incident forming the basis of this action was investigated by the Austin Police Department and other city authorities in the discharge of official duties. As a result of that investigation The City of Austin acquired full, complete, and actual knowledge of the occurrence giving rise to Plaintiffs' cause of action and that Plaintiffs were asserting a claim based on the occurrence.

## FACTS AND CAUSES OF ACTION

On or about May 7, 2012, Rosales was driving eastbound on West Cesar Chavez Street, in Austin, Travis County Texas. Col. John William Griffith, an 80 year old Veteran and beloved friend, father and grandfather, was walking with Jenny, one of his daughters, eastbound on the Hike and Bike trail near the location where North Lamar Blvd. crosses over West Cesar

-3-

Chavez Street. Diane Pulido was also walking along the trail when, suddenly and without warning, Rosales drove the 1995 Hyundai off of Cesar Chavez, over the curb and, along with objects that included a traffic warning sign installed by the City, struck John William Griffith and Diana Pulido as they were walking on the Trail. John William Griffith was seriously injured and later died from his injuries the next morning on May 8, 2012. Diana Pulido was seriously and permanently injured. At the time that Mr. Griffith was on the Hike and Bike trail, his daughter, Jenny, was walking with him and was a witness to the incident and narrowly escaped serious injury or death herself. Plaintiffs allege that Rosales was negligent, and that his negligence was a proximate cause of the incident, the death of Griffith, and the damages sustained by his Estate, the damages sustained by Frame in her individual capacity as a statutory wrongful death, the damages sustained by Frame in her individual capacity as an eye witness bystander to the horrendous incident which killed her father, and the damages sustained by Diana Pulido. But the danger facing Plaintiffs that afternoon should never have happened and never should have resulted in any death or injury in 2012. The danger of a vehicle jumping the curb and entering upon and travelling down the Hike and Bike Trail in that location was well known to the City for years before this tragedy. This death and damages would have been easily prevented if the City had simply implemented inexpensive construction and maintenance measures it previously identified and knew were needed to guard and protect users of the Hike and Bike Trail in that location.

### THE CITY OF AUSTIN WAS NEGLIGENT AND GROSSLY NEGLIGENT AND A CAUSE OF THE DAMAGES OF PLAINTIFFS

The Ann and Roy Butler Hike-and-Bike Trail at Lady Bird Lake ("Hike and Bike Trail") is owned, constructed, controlled and maintained by the City of Austin. The City markets and

-4-

touts the Hike and Bike Trail as one of the Crown Jewels of Austin and publicizes that the Hike and Bike Trail sees 1.5 million visitors a year, with that number expected to grow. On May 7, 2012, Col. Griffith, his daughter Jenny and Diana Pulido were using the Hike and Bike Trail in a manner and permitted use expected by the City when their lives were shattered by what was to them an uncommon, hidden peril - a vehicle and property debris dangerously barreling down the Hike and Bike Trail - a condition and danger that they did not reasonably expect to encounter. But it was a danger and peril that the City of Austin knew existed, never warned of and should have corrected and averted through simple construction and maintenance. Instead, the City failed to safely construct and maintain the Trail for the worst reason possible – to save a little money.

The City, including the Parks and Recreation Department, failed to maintain the Trail in a reasonably safe condition, failed to adequately warn of the unsafe condition and failed to fix or repair the dangerous condition of the Trail. The danger that killed and injured the Plaintiffs in 2012 was nothing new or unknown to the City of Austin. In the 15 years before 2012, the City knew of at least 13 prior instances of vehicles dangerously travelling up over the curb and onto the Hike and Bike Trail in the same or substantially same location. Through nothing more than serendipity and dumb luck, some of those incidents involved no injuries to people using the Trail. But other incidents did involve contact with Trail users by vehicles or debris, or both, including one in 1999 when Gov. George W. Bush and part of his detail was struck by debris when a truck and trailer lost control at the same location. In that case, a truck travelling east along First Street running parallel to the Hike and Bike trail was pulling a trailer full of debris, including scraps of wood and chunks of concrete. The driver lost control. The trailer overturned. Debris went flying across the Hike and Bike Trail. Gov. Bush, accompanied by a Texas

-5-

Department of Public Safety agent on a bicycle, happened to be jogging past. "I heard the noise, looked back, saw it start to tip and my instincts were to dive," he later told reporters. Bush ducked behind the bridge support and sustained only a scrape to his hip. The DPS agent was not as lucky; Staff Sgt. Roscoe Hughey had to be pulled from the rubble and hospitalized. There were other similar incidents between 1999 and before 2012, including contact with a pedestrian and pedestrian control devices by vehicles or debris. Yet, the City did nothing, despite policies that called for action.

The City cannot possibly deny it was on notice of the dangerous condition and the undisputed need to construct and maintain protection as these incidents occurred. Concerned citizens even contacted the City to request protection and construction and maintenance to cure the peril. Chillingly, one citizen explicitly warned the City in 2005 that the very peril at this very location where this tragedy later occurred was "a pedestrian/runner fatality waiting to happen." In fact, that is exactly what the City did – wait for a fatality to happen.

Moreover, as early as 2005, the Parks and Recreation Department identified the very hazard that ultimately killed and injured the Plaintiffs, and pursuant to policy, recognized the need for action to protect users of the Trail in that location and called for and supported the construction of a guardrail or barrier. Yet, it drug its heels and failed to act pursuant to policy already in place to construct and maintain a fix for the danger. In fact, less than two months before this incident, the PARD director noted "concerns keep coming up" and that citizens were asking why a barrier had not yet been installed on the North shore of Lady Bird Lake directly under Lamar Blvd., especially when one had been installed on the north side of Cesar Chavez for the bike path users. But none was constructed. Incredibly, the estimated $35,000 cost was cited as one reason it was not constructed. Shockingly and more repugnant, the fact that no one had

-6-

been killed yet was cited as another reason. This ministerial failure to correct identified hazards and implement a policy of maintenance and construction of corrections and safeguards to protect patrons was a proximate cause of this incident. This was not an isolated incident. A failure to implement policies has plagued the City of Austin Parks and Recreation Department. In fact, the incident made the basis of this lawsuit was recently cited by the City Auditor as one example of delays by the PARD in addressing identified safety hazards.[1] Addressing identified safety hazards is not discretionary – it is mandatory and ministerial. The report found that PARD is not managing safety hazards effectively and there is limited assurance that hazards are promptly identified and corrected. The failure of the City to act on clear policy in place to protect people such as the Plaintiffs was negligence, gross negligence and a proximate cause of the devastating injuries here and is actionable.

The acts and omissions in this matter and over the course of the previous 13 similar incidents are more than mere negligence – they are gross negligence. The acts and omissions of the City involved the subjective awareness of an extreme degree of risk, indicating conscious indifference to the rights, safety and welfare of others. Knowing about the danger and peril at issue for years, the City did nothing to warn or guard against it in what amounts to gross negligence and willful, wanton and malicious inaction. In short, the City of Austin knew about the peril, but its acts and omissions demonstrate that it simply did not care.

PREMISES DEFECT

Pleading further and in the alternative if necessary, Defendant City of Austin may be held to answer in a court of law for the conduct and occurrence as described above and incorporated

---

[1] "One person was killed, and another seriously injured, when a car jumped the curb on the Town Lake Trail in May 2012. A temporary guardrail was installed at the location and remains today. It is unclear when a decision will be made regarding safety at the location. In 1999, the Governor was injured at the same location." From the PARD Patron Safety Audit at p. 4, February 2014, finding PARD has not allocated appropriate skills, structures and resources to support the implementation of its patron safety policies.

here because the injuries and damages made the basis of this suit were caused by a premises defect and fall under a limited waiver of sovereign immunity from suits alleging personal injury or death caused by premises defects.

SPECIAL DEFECT

Pleading further and in the alternative if necessary, Defendant City of Austin may be held to answer in a court of law for the conduct and occurrence as described above and incorporated here because the injuries and damages were caused by a special defect and fall under a limited waiver of sovereign immunity from suits alleging personal injury or death caused by special defects.

RECREATIONAL USE STATUTE

Pleading further and in the alternative if necessary, Defendant City of Austin may be held to answer in a court of law for the conduct and occurrence as described above and incorporated here because the injuries and damages were caused by the City's breach of even the modest duty owed to Plaintiffs under the recreational use statute and fall under a limited waiver of sovereign immunity from suits alleging personal injury or death caused by that breach.

**DAMAGES**

As a result of the acts and/or omissions set out, Griffith sustained serious injuries which resulted in his death. Griffith's death was not, however, instantaneous. Furthermore, as a direct result of Griffith's death, Jenny Frame, Cheryl Burris and Greg Griffith have sustained damages as well. Jenny Frame is also entitled to damages as a bystander who witnessed the needless and avoidable tragedy. Plaintiffs hereby make a claim for all past and future damages recoverable under Texas law and pursuant to the Wrongful Death Act and Survival Action and bystander claims in an amount within the jurisdictional limits of the Court and which the jury deems as

-8-

just and fair, to include, but not limited to, the following:

1. The conscious physical pain and mental anguish JOHN GRIFFITH experienced prior to his death, including the physical pain and mental anguish he experienced up to his untimely death;

2. All reasonable and necessary medical expenses for any emergency care associated with the attempts to save the life of JOHN GRIFFITH, and all reasonable and necessary funeral and burial expenses of JOHN GRIFFITH;

3. The pre-death terror JOHN GRIFFITH experienced;

4. The mental anguish, including emotional pain, torment and suffering that the Plaintiff has experienced from the death of JOHN GRIFFITH;

5. The pecuniary loss Plaintiffs have suffered and will suffer, meaning the loss of care, maintenance, support, services, advice, attention, counsel, guidance, protection and reasonable contribution of pecuniary value that would, in reasonable probability, have been received by the Plaintiffs from the Decedent, JOHN GRIFFITH;

6. The loss of society and companionship representing the positive benefits flowing from the love, comfort, companionship and society that the Plaintiffs would have, with reasonable probability, experienced if JOHN GRIFFITH had lived;

7. The loss of inheritance and loss of addition to estate; and

8. As a direct and proximate result of defendants' negligence, as described above, Plaintiff Jenny Frame has suffered severe mental pain and suffering since the perception of the occurrence made the basis of this suit and of the injuries and harm and death sustained by her father.

As a result of the acts and/or omissions set out, Pulido sustained serious injuries and

-9-

incurred medical expenses for the necessary care of those injuries. Diana Pulido's injuries include, but are not limited to, a head injury, fractured tibia and fibula, a fractured shoulder, a fractured pelvis, a fractured clavicle and multiple lacerations and contusions. She has required multiple surgeries and extensive rehabilitation. With reasonable medical probability, Pulido will continue to incur medical expenses for the necessary treatment of her injuries in the future. In addition, Pulido has suffered loss of earning capacity, physical pain, mental anguish, physical impairment, and disfigurement resulting from her injuries and is expected to suffer from her injuries in the future.

## JURY DEMAND

Plaintiffs hereby respectfully demand a trial by jury and have tendered the appropriate fee to the Clerk of the Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Defendants be cited to appear and answer herein, that after trial and hearing, Plaintiff have and recover all of the damages prayed for above, and for any and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

HOWRY BREEN & HERMAN, L.L.P.

/s/ Sean E. Breen

_____

Sean E. Breen
sbreen@howrybreen.com
State Bar No. 00783715
1900 Pearl Street
Austin, Texas 78705-5408
(512) 474-7300
(512) 474-8557 FAX

-10-

**ATTORNEYS FOR PLAINTIFFS JENNY FRAME, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JOHN WILLIAM GRIFFITH, GREG GRIFFITH, and CHERYL BURRIS**

SLACK & DAVIS, L.L.P.

/s/ Mike Davis

_____

Mike Davis
mdavis@slackdavis.com
State Bar No. 05549500
Slack & Davis, LLP
2705 Bee Cave Road, Suite 220
Austin, Texas 78746
(512) 795-8686

**ATTORNEYS FOR PLAINTIFF DIANA PULIDO**

## CERTIFICATE OF SERVICE

I certify that May 7, 2014, I sent a true and complete copy of this pleading via electronic filing, certified U.S. mail, regular U.S. mail and/or by facsimile to the following persons in accordance with the Texas Rules of Civil Procedure:

Virginia I. Hermosa
Hermosa Law Firm
503 West 17th St, Suite 200
Austin, Texas 78701

/s/ Sean E. Breen

_____

Sean Breen

-11-

# TAB 2

# City of Austin



**A Report to the Austin City Council**

**Mayor**
Lee Leffingwell

**Mayor Pro Tem**
Sheryl Cole

**Council Members**
Chris Riley
Mike Martinez
Kathie Tovo
Laura Morrison
Bill Spelman

## Office of the City Auditor

**City Auditor**
Kenneth J. Mory
CPA, CIA, CISA, CRMA

**Deputy City Auditor**
Corrie E. Stokes
CIA, CGAP, CFE

# Parks and Recreation Department (PARD) Patron Safety Audit

February 2014





EXHIBIT

B

## REPORT SUMMARY

While PARD has policies in place that address managing risks to patron safety, PARD has not allocated the appropriate skills, structures, and resources to support the implementation of its patron safety policies. As a result, PARD is not managing safety hazards effectively and there is limited assurance that hazards are promptly identified and corrected.

## TABLE OF CONTENTS

BACKGROUND ..................................................................................................................................1

OBJECTIVE, SCOPE, AND METHODOLOGY ......................................................................................1

AUDIT RESULTS...............................................................................................................................2

**Appendix**
Appendix A: Management Response.................................................................................................8

**Exhibits**
Exhibit 1: Implementation of Hazard Identification Policies ............................................................3
Exhibit 2: Implementation of Patron Safety Hazard Correction Policies ...........................................4
Exhibit 3: Concrete Safety Hazard at Dougherty Arts Center ...........................................................5
Exhibit 4: Play Area at the Dougherty Arts Center...........................................................................5
Exhibit 5: Minor Hazard at Dougherty Arts Center..........................................................................6

## GOVERNMENT AUDITING STANDARDS COMPLIANCE

We conducted this performance audit in accordance with Generally Accepted Government Auditing Standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## AUDIT TEAM

Niki Raggi, CGAP, CRMA, CICA, Assistant City Auditor
Christopher Shrout, CGAP, Auditor-in-Charge
Felipe Garcia-Colon, CGAP, Auditor

Office of the City Auditor
Austin City Hall
phone: (512)974-2805
email: oca_auditor@austintexas.gov
website: http://www.austintexas.gov/auditor

Copies of our audit reports are available at http://www.austintexas.gov/auditor/reports



*Printed on recycled paper*
*Alternate formats available upon request*



## PARD PATRON SAFETY AUDIT

**Audit Report Highlights**

### Why We Did This Audit

This audit was conducted as part of the Office of the City Auditor's (OCA) FY 2014 Strategic Audit Plan.

### What We Recommend

The Director should allocate the necessary skills and resources to appropriately implement the PARD patron safety program and monitor its effectiveness.



For more information on this or any of our reports, email oca_auditor@austintexas.gov

Mayor and Council,

I am pleased to present this audit on patron safety at Parks and Recreation facilities.

### BACKGROUND

This audit was placed on the Fiscal Year 2014 Strategic Audit Plan as result of a risk assessment performed by the Office of the City Auditor that identified PARD as the City department with the highest risks related to managing the safety of patrons at its facilities.

PARD is responsible for a total of 330 locations. PARD facilities include, but are not limited to, parks, recreation centers, senior centers, cultural centers, pools, splash pads, and cemeteries. PARD staff estimates over five million patrons visit their facilities annually.

### OBJECTIVE AND SCOPE

The objective of the audit was to determine if PARD has an effective system to identify, address, and mitigate risks to patron safety.

The audit scope included PARD patron safety activities for Fiscal Years 2012 and 2013.

### WHAT WE FOUND

While PARD management has developed and approved policies aimed at identifying and managing hazards related to patron safety, PARD executive management has not allocated the appropriate skills, structures, and resources to support the implementation of its patron safety policies.

Key elements of the PARD patron safety program include requirements for hazard identification, data analysis, and hazard correction and monitoring. However, required annual safety audits are not consistently conducted, incidents and injury data is not thoroughly analyzed, and hazards identified are not monitored through correction.

As a result, PARD is not effectively managing hazards related to patron safety and there is limited assurance that hazards identified are corrected promptly.

We appreciate the cooperation and assistance we received from PARD staff during this audit.

Kenneth J. Mory, City Auditor

## BACKGROUND

This audit was placed on the Fiscal Year (FY) 2014 Strategic Audit Plan as result of a risk assessment performed by the Office of the City Auditor (OCA) that identified PARD as the City department with the highest risks related to managing the safety of patrons at its facilities.

PARD is responsible for a total of 330 locations. PARD facilities include, but are not limited to, parks, recreation centers, senior centers, cultural centers, pools, splash pads, and cemeteries. PARD staff estimates over five million patrons visit their facilities annually.

## OBJECTIVE, SCOPE, AND METHODOLOGY

The PARD Patron Safety Audit was conducted as part of the OCA FY 2014 Strategic Audit Plan, as presented to the City Council Audit and Finance Committee.

### Objective

The objective of the audit was to determine if PARD has an effective system to identify, address, and mitigate risks to patron safety.

### Scope

The audit scope included PARD patron safety activities for Fiscal Years 2012 and 2013. Patron safety activities refer to measures taken by PARD to protect the public at department facilities.

### Methodology

To accomplish our audit objectives, we performed the following steps:

- conducted a survey of 14 PARD division managers regarding patron safety efforts within PARD;
- assessed local media coverage related to patron safety at PARD facilities;
- conducted interviews with PARD staff;
- reviewed safety industry practices;
- analyzed department policies and procedures related to patron safety;
- reviewed relevant claims and lawsuits against the City related to PARD;
- analyzed PARD incident and injuries databases;
- reviewed safety inspection reports for PARD facilities;
- visited numerous PARD facilities including playgrounds, recreation centers, senior centers, and golf facilities; and
- analyzed laws applicable to patron safety at municipal facilities.

## AUDIT RESULTS

Finding: PARD has not allocated the appropriate skills, structures, and resources to support the implementation of its patron safety policies. As a result, PARD is not managing safety hazards effectively and there is limited assurance that hazards are promptly identified and corrected.

According to the various safety industry practices we reviewed, organizations should have a system in place to provide reasonable assurance that key hazards are identified. Further, after detection, significant current and potential hazards should be prevented, corrected, or controlled in a timely manner.

PARD has developed and approved policies aimed at identifying and managing hazards related to patron safety that are in line with the Commission for Accreditation of Park and Recreation Agencies (CAPRA) requirements. Specifically, per policies PARD should:
1. inspect, audit, and investigate all department property to identify hazards;
2. gather and analyze relevant data to identify trends and make recommendations for corrective actions; and
3. ensure that corrective actions are addressed and monitor PARD compliance with its safety program.

However, based on our analysis and observations, executive management has not allocated the appropriate skills, structures, and resources to support the implementation of its patron safety policies. As a result, PARD is not managing safety hazards effectively and there is limited assurance that hazards identified are corrected promptly.

PARD policies assign the responsibility of administering its patron and occupational safety programs to a Safety Office who should report directly to the department executive team. In practice, PARD does not have a Safety Office dedicated to administering these programs. In the absence of a Safety Office, patron safety responsibilities have been assigned to the department Occupational Health and Safety Coordinator, whose primary focus is worker safety and who organizationally reports to a Human Resource Supervisor within the Management Services division. In addition, PARD has a Certified Playground Coordinator who reports to the Maintenance Division Manager.

The three sections below outline the disconnect between policies and implementation in each of the three hazard management areas identified above.

### 1. Hazard Identification

In order to timely identify safety hazards, PARD policies require periodic site inspections and annual safety audits to be conducted on each PARD facility. Additionally, the City's Child Care ordinance requires that each facility that hosts recreational programs undergo an annual safety inspection. As shown in Exhibit 1, safety inspections are not consistently conducted, documented, and monitored as required.

**EXHIBIT 1**
**Implementation of Hazard Identification Policies**

| PARD Policy Requirement | Implemented? | OCA Observations |
|---|---|---|
| The Safety Officer, in coordination with site supervisors, should conduct a comprehensive annual safety audit on each staffed PARD facility | No | A total of 2 of 118 staffed PARD facilities in FY 2013 received a comprehensive safety audit by the Occupational Health and Safety Coordinator |
| Playgrounds are to undergo an annual playground audit by a certified playground safety inspector | Partially | 52 of 99 PARD-identified playgrounds received an audit by a certified playground inspector in FY 2013 |
| Division Managers are responsible for ensuring that each location of operation receives random in-house safety and health self-inspections with results forwarded to the Safety Office for review | Partially | Based on our review of documentation for the recreation centers in the south and north districts, recreation centers receive periodic maintenance inspections or safety self-inspections; however, the results of these inspections are not provided to the Occupational Health and Safety Coordinator and there is not a system to ensure division managers receive and review inspection results |

SOURCE: PARD policies and OCA observations during the course of the audit, September-December 2013

## 2. Data collection and analysis

According to PARD policy, safety staff should collect and analyze data, including incidents and injuries, on an ongoing basis. Such analysis should lead to recommendations to identify trends and prevent common types of accidents. All incidents and injuries shall be entered into the PARD injury and incident database and forwarded to the Safety Office. However, we found that PARD does not have a central database for all incidents or injuries that occur at PARD facilities. Rather, there are three separate systems (general database, aquatic database, and Park Ranger database) and these datasets are not reviewed or analyzed in the aggregate. In addition, summary annual inspection information and patron safety summary data from the general database is not reported to executive management.

Additionally, according to OCA analysis, the information in the databases is incomplete, contains information that is not relevant, and the data is not categorized in a manner that provides useful trend analysis. For example, the general PARD database contains over 70 categories of injuries, including: *cut, fall, minor, scratches, minor scrapes, hit, hit in the mouth, bee sting, mashed fingers, major, and red mark on forehead.* Also, there is confusion over what constitutes an incident and what constitutes an injury. According to PARD policy, injuries are minor accidents that require at most on-site first aid, while incidents are major accidents that require EMS assistance. However, according to OCA analysis, 70% of the reported incidents are categorized as general conduct and relate to children's behavioral issues.

### 3. Hazard correction

As indicated above, after detection, significant current and potential hazards should be prevented, corrected, or controlled in a timely manner. Per PARD policies, when a hazard is identified, it is either corrected by eliminating the cause of the hazard at the source or is effectively controlled, such as controlling or limiting access to a specific area. However, as shown in Exhibit 2, currently there is no mechanism to ensure that once identified, hazards are actually corrected.

**EXHIBIT 2**
**Implementation of Patron Safety Hazard Correction Policies**

| PARD Policy Requirement | Implemented? | OCA Observations |
|---|---|---|
| The Safety Officer should conduct follow-up inspections to ensure corrective action is taken | No | We found no evidence that routine follow-up is conducted |
| The Safety Office is responsible for monitoring the implementation of the safety program to ensure compliance | No | Documentation needed to evaluate compliance with the safety program is not maintained in a central location |

SOURCE: PARD policies and OCA observations during the course of this audit, September-December 2013

Over the course of our audit, we found various instances of delays in addressing identified safety hazards. For example:

- The Annual Playground Conditions Overview Report from November 2012 identified eight playground locations with non-compliant safety hazards that, according to priority ratings established by the International Playground Safety Institute, are "non-compliant safety concerns that may result in permanent disability, loss of life or body part, and should be corrected immediately." As of December 2013, only four of the eight playscapes have had the hazards mitigated. Although the implementation of a new playscape is assigned to the Capital Improvement Planning Division, there appears to be disagreement between this division and the Maintenance Division over what PARD division is responsible for mitigating the existing hazards.
- A tree fell and injured a park patron on the Town Lake Trail in September 2013; PARD had identified the tree for removal a month prior.
- The Occupational Health and Safety Coordinator asserted that he has identified safety hazards at multiple PARD locations, but due to disagreement with PARD division managers over the severity of the hazard, action was not taken to mitigate the hazard.
- One person was killed, and another seriously injured, when a car jumped the curb on the Town Lake Trail in May 2012. A temporary guardrail was installed at the location and remains today. It is unclear when a decision will be made regarding safety at the location. In 1999, the Governor was injured at the same location.

- A safety issue at the Dougherty Arts Center (DAC) play area was identified by the site supervisor, Occupational Health and Safety Coordinator, and playground inspector. The hazard was partially addressed in the summer of 2013, only after a child injured his head and required stitches.

**EXHIBIT 3**
**Concrete Safety Hazard at the DAC (Since Removed)**



SOURCE: PARD photo, June 2013

- The site supervisor and the Occupational Health and Safety Coordinator indicated that the play area at the DAC in its current condition continues to present a possible hazard to children (shown below). The Occupational Health and Safety Coordinator has proposed alternative options to the current play area, but an alternative plan has not been agreed upon.

**EXHIBIT 4**
**DAC Play Area as of January 2014**

SOURCE: OCA photo, January 2014

- Site visits conducted by our staff in conjunction with PARD staff indicate there are various minor outstanding safety hazards at the DAC, Hancock Recreation Center, and Jimmy Clay Golf Barn, including slippery conditions on steps and stairways and an ADA ramp with a rotten railing, shown below.

**Exhibit 5**
**Minor Hazard at Dougherty Arts Center**



**SOURCE**: OCA photo, January 2014

Executive management support is critical to the successful implementation of any policy. While PARD executive management commitment is clearly spelled out in its safety policies, as mentioned above, this commitment has not been supported by the appropriate skills, resources, and structures.

Without a structure in place to ensure safety inspections occur, without relevant safety data being collected and analyzed, and without a mechanism to ensure identified hazards are addressed timely, there is limited assurance that hazards to patron safety at PARD facilities are promptly identified and corrected. As a result, the City may subject its patrons to preventable harm and itself to legal and financial liability.

## RECOMMENDATION

The recommendations listed below are a result of our audit effort and subject to the limitation of our scope of work. We believe that these recommendations provide reasonable approaches to help resolve the issues identified. We also believe that operational management is in a unique position to best understand their operations and may be able to identify more efficient and effective approaches and we encourage them to do so when providing their response to our recommendations. As such, we strongly recommend the following:

**In order to ensure that PARD has a system in place to provide reasonable assurance that patron safety risks are identified and addressed timely, the Director should allocate necessary skills and resources to appropriately implement the PARD patron safety program and monitor its effectiveness.**

MANAGEMENT RESPONSE:   **Concur.**   Refer to Appendix A for management response and action plan.

## MANAGEMENT RESPONSE - ACTION PLAN



City of Austin
Parks and Recreation Department
200 South Lamar Blvd, Austin, TX 78704

January 8, 2014

Mr. Kenneth J. Mory, City Auditor
Office of the City Auditor
Kenneth.mory@austintexas.gov

Subject: Parks and Recreation Department Patron Safety Audit

Mr. Mory,

Please find attached the Parks and Recreation Department's (PARD) response to the Patron Safety Audit dated January 6, 2014.

I have reviewed the report findings and recommendations associated and agree with the report recommendation:

"In order to ensure that PARD has a system in place to provide reasonable assurance that patron safety risks are identified and addressed timely, the Director should allocate necessary skills and resources to appropriately implement the PARD patron safety program and monitor its effectiveness."

In response to the findings, PARD intends to implement the following phased action plan and timeline:

| Recommendation | Concurrence and Proposed Strategies for Implementation | Status of Strategies | Proposed Implementation Timeline |
|---|---|---|---|
| In order to ensure that PARD has a system in place to provide reasonable assurance that patron safety risks are identified and addressed timely, the Director should allocate necessary skills and resources to appropriately implement the PARD patron safety program and monitor its effectiveness | Create a comprehensive inspection system to identify potential hazards within recreational facilities, specialized amenities and the general park system; inspection protocols will include consistent documentation of departmental responses to said hazards, as well as ongoing monitoring to ensure the effectiveness of remedial actions taken | Planned | September 30, 2014 |
| | Create a centralized incident/accident database for incidents/injuries that occur at PARD parks and facilities to include data categorization, trend analysis and regular reporting to the executive team | Planned | September 30, 2014 |

The City of Austin is committed to compliance with the Americans with Disabilities Act.
Reasonable modifications and equal access to communications will be provided upon request.

City of Austin
Parks and Recreation Department
200 South Lamar Blvd, Austin, TX 78704

| In order to ensure that PARD has a system in place to provide reasonable assurance that patron safety risks are identified and addressed timely, the Director should allocate necessary skills and resources to appropriately implement the PARD patron safety program and monitor its effectiveness | Continue the playground replacement program, with the intention of completing the replacement FY 2013 replacement phase by the end of FY 2014 | Underway | September 30, 2014 |
|---|---|---|---|
| | Begin design processes for additional playground sites identified by the audit in FY 2014 and complete construction by end of FY 2015 | Planned | September 30, 2015 |
| | Review the scope of current Safety training, and provide additional training as necessary to ensure that departmental training curricula appropriately applies to departmental Safety demands | Planned | September 30, 2014 |
| | Through the 2015 City of Austin budget approval process, request funding to support a Department Occupational Health and Safety Officer | Underway | September 30, 2014 |

The Department is committed to ensuring parks and recreational facilities are safe for all to enjoy. The completion of the above action plan will allow us to meet this goal.

Sincerely,

Sara Hensley, CPRP, Director
Austin Parks and Recreation Department

cc:    Marc A. Ott, City Manager
       Bert Lumbreras, Assistant City Manager
       Cora Wright, Assistant Director
       Jesse Vargas, Assistant Director
       Kimberly McNeeley, Assistant Director